TRIPLE–A BASEBALL CLUB ASSOCI-
ATES, Jordan Kobritz, and Triple-A
Baseball Club of Maine, Inc., Plaintiffs,

v.

NORTHEASTERN BASEBALL,
INC., Defendant.

TRIPLE–A BASEBALL CLUB ASSOCI-
ATES, Jordan Kobritz, and Triple-A
Baseball Club of Maine, Inc., Plaintiffs,

v.

INTERNATIONAL LEAGUE OF PRO-
FESSIONAL BASEBALL CLUBS,
Defendant and Third-Party Plaintiff,

v.

MULTI–PURPOSE STADIUM AUTHOR-
ITY OF LACKAWANNA COUNTY,
Third-Party Defendant.

Civ. Nos. 86–0331–P, 86–0360–P.

United States District Court,
D. Maine.

Judgment Feb. 20, 1987.
Opinion March 11, 1987.

Keith A. Powers, Jeffrey T. Edwards, Portland, Me., for plaintiffs.

Frank A. Ray, Columbus, Ohio, Joseph M. Cloutier, Camden, Me., for defendant Intern. League.

Thomas B. Wheatley, John A. Hobson, Portland, Me., Richard S. Bishop, Scranton, Pa., for defendants Northeastern Baseball and Multi-Purpose Stadium.

## JUDGMENT

GENE CARTER, District Judge.

At the joint request of the parties herein the Court enters its judgment in the above entitled matter, the Court's Opinion to follow in due course.

It is hereby *ORDERED* that judgment enter in Civil No. 86–0331–P as follows;

### I. *Plaintiffs' Claims*

(1) Judgment on Counts I, II, IV and V of the Plaintiffs' complaint to enter for the defendant, Northeastern Baseball, Inc.;

(2) Judgment on Count III of the Plaintiffs' complaint to enter for Plaintiffs on plaintiffs' claim for a declaratory judgment and it is hereby *DECLARED* and *ADJUDGED* that the September 3, 1986 purchase and sale agreement between the Plaintiffs Triple-A Baseball Club Associates, Jordan Kobritz, and Triple-A Baseball Club of Maine, Inc., general partners, and Northeastern Baseball, Inc. is null, void and without further force or effect having terminated by its own terms on the failure of an implied condition precedent to performance of the agreement; Plaintiffs to return

forthwith the contract deposit of One Hundred Thousand Dollars ($100,000) with accrued interest thereon in accordance with Paragraph 14 of said agreement.

### II. *Claims of Northeastern Baseball, Inc.*

Judgment is entered on the counterclaims of the Counterclaim Plaintiff Northeastern Baseball, Inc., against the Plaintiffs Triple-A Baseball Club Associates, Jordan Kobritz, and Triple-A Baseball Club of Maine, Inc., general partners, as follows;

(1) Judgment on Count I of the counterclaim to enter for the Counterclaim Defendants, Triple-A Baseball Club Associates, *et al.*;

(2) Judgment on Count II of the counterclaim to enter for the Counterclaim Defendants, Triple-A Baseball Club Associates, *et al.*

It is hereby *ORDERED* that judgment enter in Civil No. 86–0360–P as follows;

### I. *Plaintiffs' Claims Against the International League of Professional Baseball Clubs*

(1) Judgment to enter on Count I for the Plaintiffs, Triple-A Baseball Club Associates, *et al.* on the claim for equitable relief and it is hereby *ORDERED* that the Defendant, International League, restore the Plaintiff, Triple-A Baseball Club Associates, to full membership rights in the Defendant, International League, in accordance with the provisions of the Constitution, By-laws, and Rules and Regulations of the Defendant, International League;

(2) Judgment to enter on Count II for the Defendant, International League of Professional Baseball Clubs;

(3) Judgment to enter on Count III for the Defendant, International League of Professional Baseball Clubs;

(4) Judgment to enter on Count IV for the Defendant, International League of Professional Baseball Clubs;

(5) Judgment to enter on Count V for the Defendant, International League of Professional Baseball Clubs.

**516**

## II. Claims of International League Against Plaintiffs

Judgment is entered on the claims of the International League against plaintiffs, Triple-A Baseball Club Associates *et al.*, Northeastern Baseball, Inc. and Multi-Purpose Stadium Authority as follows;

(1) Judgment is *RESERVED* on the cross-claim of the International League against Northeastern Baseball, Inc. and Multi-Purpose Stadium Authority seeking contribution and indemnification as these claims were bifurcated for purposes of trial and remain *PENDING* for later disposition;

(2) Judgment on Count II seeking a declaration that the International League has exclusive jurisdiction to determine whether the Plaintiff Triple-A Baseball Club Associates or Defendant, Northeastern Baseball, Inc. holds membership in the league not to enter, the claims having become *MOOT* on the stipulation at trial of the defendant, International League, that it would honor the Court's decision determining the ownership of the Triple-A franchise as determinative of membership in the International League as between the Plaintiff Triple-A Baseball Club Associates and Defendants Northeastern Baseball, Inc. and Multi-Purpose Stadium Authority;

(3) Judgment to enter on Count III alleging tortious interference with the league's business relationships for the Plaintiffs, Triple-A Baseball Club Associates, *et al.*, and Defendants Northeastern Baseball, Inc. and Multi-Purpose Stadium Authority; and

(4) Judgment to enter on Count IV alleging a breach of contract by failure to comply with the International League's constitution for Plaintiffs, Triple-A Baseball Club Associates, *et al.*, and Defendants Northeastern Baseball, Inc. and Multi-Purpose Stadium Authority.

## III. Plaintiffs' Claims Against the Multi-Purpose Stadium Authority

Judgment is entered on the claims of Plaintiffs against the Defendant, Multi-Purpose Stadium Authority, as follows;

(1) Judgment on Count I to enter for Defendant, Multi-Purpose Stadium Authority;

(2) Judgment on Count II to enter for Defendant, Multi-Purpose Stadium Authority.

## IV. Costs

All prevailing parties shall recover costs as provided by law.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

These consolidated actions grow out of a business deal involving the sale of two minor league baseball franchises—the Triple-A Maine Guides and the Double-A Waterbury Indians—and a related dispute over membership in the Triple-A International League of Professional Baseball Clubs. Jurisdiction is based upon diversity of citizenship; the parties stipulate that Maine law controls all issues with the exception that Virginia law controls the formation and corporate status of the International League. The case was tried without a jury, and the Court herein sets forth its findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a). Before doing so, the Court will give a brief introductory overview of the parties, the dispute, and the resulting causes of action.

Plaintiffs are Triple-A Baseball Club Associates, a Maine Limited Partnership (hereinafter "the Limited Partnership"); Jordan Kobritz, general partner of the Limited Partnership ("Kobritz"); and Triple-A Baseball Club of Maine, Inc., another general partner of the Limited Partnership. (Kobritz owns all the stock in his corporate general partner.) Defendants are Northeastern Baseball, Inc., a Pennsylvania nonprofit corporation ("NBI"); the Multi-Purpose Stadium Authority of Lackawanna County, Pennsylvania, an entity of the Commonwealth of Pennsylvania ("MPSA"); and the International League of Professional Baseball Clubs, Inc., a Virginia nonprofit corporation ("International League").

Although not parties, two other important actors in the case are the Eastern League of Professional Baseball Clubs, Inc., ("Eastern League"), and the National Association of Professional Baseball

Leagues ("National Association"), the governing body of minor league baseball. Both the International League and the Eastern League are members of the National Association and are bound to operate in accordance with its rules, known as the National Association Agreement.

The main dispute grows out of a September 3, 1986 agreement between the Limited Partnership, its two general partners, and NBI. Under this agreement, the Limited Partnership agreed to sell its Triple-A International League franchise, the Maine Guides, to NBI for $2.4 million and NBI agreed to sell its Double-A Eastern League franchise, the Waterbury (Connecticut) Indians, to the Limited Partnership for $400,-000. The agreement was contingent upon the approval of both leagues, with the proviso that if the Eastern League "refuse[d] to approve" the sale of the Double-A franchise to the Limited Partnership, the agreement would remain in effect but the price of the Triple-A franchise would be reduced to $2 million. A September 4, 1986 side agreement between Kobritz individually and NBI provided in part that if in spite of the parties' best efforts the Eastern League refused to approve the sale of the Double-A franchise both to the Limited Partnership and to Kobritz individually, NBI would pay Kobritz individually a consulting fee of not less than $400,000. This agreement was contingent upon NBI's acquisition of the Triple-A franchise pursuant to the September 3 agreement.

The International League approved the assignment by the Limited Partnership of the Triple-A franchise to NBI and subsequently permitted NBI, rather than the Limited Partnership, to vote at International League meetings.[1] But the Eastern League never approved the transfer of the Double-A franchise either to the Limited Partnership or to Kobritz individually. NBI appeared at the scheduled closing, ready to pay the Limited Partnership $2 million for the Triple-A team but not to convey the Double-A franchise to either the Limited Partnership or Kobritz; Plaintiffs refused to convey the Triple-A franchise.

Plaintiffs assert five causes of action against NBI. Counts I, II, and III all assert that under the September 3 agreement, NBI had a duty to act in good faith and that, because the Eastern League never actually "refuse[d] to approve" the transfer, NBI had a duty to convey the Double-A franchise. Count I asserts that NBI repudiated and Count II that NBI breached its obligations; Count III asserts that the September 3 agreement terminated by its own terms. All three counts seek a declaration that the September 3 agreement is without force or effect and Counts I and II further seek consequential damages resulting from an alleged delay in the Limited Partnership's preparations for the 1987 baseball season. Count IV asserts that NBI converted Plaintiffs' Triple-A franchise by wrongfully exercising membership rights in the International League without holding title to the franchise; Count IV seeks consequential damages as just described plus damages equal to the value of the franchise itself and an injunction against NBI's further exercise of the Limited Partnership's league membership rights. Count V asserts that NBI's bad faith and failure to use its best efforts to obtain Eastern League approval constitute a breach of the September 4 side agreement between NBI and Kobritz individually; Plaintiffs seek damages in an amount equal to the value of the Double-A franchise plus consequential damages.

Plaintiffs assert two causes of action against MPSA, both resulting from NBI's assignment to MPSA of NBI's rights under the September 3 agreement. Count I alleges conversion, asserting the same theory and seeking the same relief as in Count IV of Plaintiffs' complaint against NBI. Count II alleges that the assignment from NBI to MPSA was fraudulent because it was made for less than fair consideration and because NBI had no property interest in the Triple-A franchise that it could assign; Plaintiffs seek an avoidance of the

---

**1.** As discussed more fully *infra,* the International League actually recognized MPSA as a member; NBI participated in league affairs as MPSA's agent.

transfer and an injunction against MPSA's further exercise of the Limited Partnership's International League membership rights.

Plaintiffs assert five causes of action against the International League, all based on the league's recognition of NBI (or MPSA) rather than the Limited Partnership as a league member and franchise owner. Count I asserts a violation of the International League's duty to operate in accordance with its constitution;[2] Plaintiffs seek a declaration that the International League has violated such a duty, and an injunction against further violations. Count II asserts that the International League, its officers, and a majority of its directors have acted oppressively and in breach of fiduciary duties toward the Limited Partnership as a minority member of the league; Plaintiffs seek relief similar to that sought in Count I as well as damages. Count III asserts that the International League wrongfully removed Kobritz from his position as a director of the league; Kobritz seeks a declaration that he remains a director and an injunction against the International League's refusal to treat him as such. Count IV asserts that the International League tortiously interfered in contractual relations between the Limited Partnership and NBI; Plaintiffs seek the value of their bargain with NBI plus consequential damages and an injunction against the International League's refusal to recognize the Limited Partnership as owner of the Triple-A franchise. Count V asserts that the International League converted the Limited Partnership's property and seeks relief similar to that sought in Count IV.

NBI asserts two counterclaims against the Limited Partnership. Count I seeks a declaration that the September 3 agreement remains in effect and an order for specific performance of that agreement for the alternative consideration ($2 million for the Triple-A franchise) provided for therein. Count II asserts that Plaintiffs' refusal to close constituted a breach of the September 3 agreement and requests incidental and consequential damages and an order for specific performance.

The International League has filed four claims. Count I is a claim against NBI and MPSA seeking a declaration that they are contractually obligated to hold the league harmless for any money judgment entered against the league in this action; this claim has been bifurcated from the others for later disposition. Count II seeks a declaration that the International League has exclusive jurisdiction to determine whether the Limited Partnership or NBI holds membership in the league.[3] Count III asserts that Plaintiffs, NBI, and MPSA have tortiously interfered with the league's business relationships and prospective business advantage and seeks monetary relief. Count IV asserts that Plaintiffs, NBI and MPSA breached a contract by failing to comply with the International League's constitution and similarly seeks monetary relief.

Having previously issued its judgment in this matter in order to accommodate the parties' need for the earliest possible resolution of the dispute, the Court now issues its findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

During 1984 John McGee, president of Northeastern Baseball, Inc. (NBI), explored the possibility of building a Triple-A baseball stadium in the Scranton, Pennsylvania area and purchasing a Triple-A franchise to play in it. He also explored the possibility of obtaining a Double-A franchise to play in the proposed stadium until a Triple-A

---

**2.** In accordance with Fed.R.Civ.P. 8(f), the Court liberally construes Count I as asserting a claim for breach of contract. The Court notes that the International League itself has treated its constitution as a contract by asserting a breach-of-contract claim against Plaintiffs based on Plaintiffs' asserted failure to comply with the league constitution.

**3.** At trial the International League represented to the Court that it would respect as determinative of league membership the Court's determination of which party owns the Triple-A franchise. The Court therefore considers Count II to be moot.

franchise could be obtained, in the event a Triple-A franchise could not be obtained before or upon completion of the stadium. McGee learned that a Double-A franchise, the Waterbury (Connecticut) Indians of the Eastern League, was for sale, and he arranged to buy it. McGee later became solicitor to the Multi-Purpose Stadium Authority of Lackawanna County, Pennsylvania, (MPSA), a government entity created to build the stadium.

On September 22, 1984, McGee appeared before a meeting of the eight Eastern League directors (one from each member franchise) to seek approval of the franchise ownership transfer as required by the Eastern League constitution. McGee was asked about his plans for owning and operating the Waterbury Indians; he told the league directors of his plans to build a stadium for the 1987 season in Scranton and to operate the team in Waterbury in 1985 and 1986. McGee also told the league directors that he hoped ultimately to bring a Triple-A franchise to Scranton but that the Waterbury team would be moved to Scranton if no Triple-A franchise had been acquired by the time the stadium was ready. Although some Eastern League members felt that McGee would be required to move the Waterbury team to Scranton once the stadium was completed, the minutes of the meeting reflect two separate votes, neither of which established such a requirement. One vote approved the transfer of the franchise to an NBI subsidiary contingent upon a satisfactory closing of the deal with the franchise's then-current owners; the other vote authorized the Waterbury franchise to move to Scranton contingent upon the completion of a stadium satisfying Eastern League standards.

At the same meeting the Eastern League held two more formal votes conditionally approving the transfer of another Eastern League franchise to a new owner and a new city. These votes and the votes on the transfer of the Waterbury franchise were in accordance with the Eastern League's usual procedure for considering and voting on a request for approval of the transfer of a franchise.

In March of 1985, McGee wrote to Eastern League president Charles Eshbach requesting that the Eastern League approve NBI's exploration of the possibility of obtaining a Triple-A franchise for Scranton. The letter noted that although NBI was not at the time operating in Scranton, such approval was required by Section 10.08(f) of the National Association Agreement, the set of rules governing minor league baseball. That section requires that "[b]efore a franchise operator ... may explore the possibility of elevating his city to a league of higher classification, he must first obtain the written permission of a majority of the directors of the league of which his club is a member" or face a $2500 fine. A Triple-A league such as the International League is a league of "higher classification" than the Double-A Eastern League. After polling the Eastern League directors, Eshbach wrote to McGee in June of 1985 conditionally granting permission for "the Waterbury/Scranton franchise" to explore elevation, emphasizing that the league had not approved of Scranton actually elevating to Triple-A nor had the league waived its right to "compensation" from NBI in the event NBI actually elevated.

Eshbach's mention of "compensation" referred to a payment that would be made to the Eastern League to compensate the league for the loss of its asserted "territorial rights" in Scranton. Territorial rights are created by Section 10.06 of the National Association Agreement; such rights basically cover a ten-mile radius around the city in which a franchise is granted, "provided the franchise holder operates a [club] within such protected territory." Both the league and the club hold these territorial rights, the effect of which is that no club in any league party to the National Association Agreement may play within the protected territory of another club and league without first obtaining the consent of that club and league. Under Section 10.08 of the National Association Agreement, a league and club of higher classification (*e.g.*, Triple-A) may acquire or "draft" the territory belonging to a league and club of lower classification (*e.g.*, Double-A). Sec-

tion 10.08 requires the acquiring league and club to pay compensation to the league and club giving up the territory; the amount may be determined by agreement of the parties, or, failing agreement, by binding arbitration. Section 10.08 thus appears to contemplate a four-party transaction in which, for example, a Triple-A league and club acquire the territory of and pay compensation to a Double-A league and club. The Double-A league and club may then draft (and pay compensation for) Single-A territory into which to relocate the displaced Double-A club.

This is to be distinguished from a three-party transaction in which a club itself, *e.g.*, a Double-A club, seeks to leave a Double-A league and join a Triple-A league, *i.e.*, to "elevate." In such a case the Double-A league would be losing both territory and a club. Although Section 10.08 does not on its face require that the Double-A league be compensated in case of elevation, in practice a club elevating from a Double-A league to a Triple-A league has itself paid "indemnification" to compensate the Double-A league for its loss of territorial rights. In 1984 an Eastern League club in Buffalo, New York paid the Eastern League $16,000 in exchange for permission to leave that league for a Triple-A league. Also in 1984, a Double-A club in Nashville, Tennessee paid its Double-A league between $170,000 and $250,000 for permission to leave that league for a Triple-A league.

Eshbach's June 1985 letter to McGee, conditionally approving NBI's exploration of elevation to Triple-A, notified McGee that the Eastern League directors felt that, concerning compensation, the Buffalo precedent was not applicable and that any indemnification would be strongly influenced by the Nashville settlement. By this Eshbach meant that the Eastern League had a stronger interest in having a franchise in Scranton than it did in Buffalo, and thus the amount of indemnification that the Eastern League would seek if NBI sought to elevate to Triple-A would be closer to the $170,000–$250,000 Nashville figure than the $16,000 Buffalo figure.

At a July 15, 1985 Eastern League meeting, NBI's request to investigate elevation to Triple-A was once again discussed. McGee stated his view that tying indemnification to that request was premature; an Indemnification Committee was formed to make recommendations on what indemnification ultimately to seek if NBI elevated. McGee, Eshbach, and two other league directors (Jerry Mileur and Stuart Revo) agreed to serve on the committee. The league then voted to grant NBI "permission to explore elevation to Triple-A with the understanding that approval to make such elevation will be forthcoming from the league's Directors only if Scranton (the current Waterbury club) and the league can reach full and formal agreement on the amount and payment of indemnification by Scranton to the league without resorting to arbitration or litigation." McGee was thus on notice that the Eastern League directors believed the league had territorial rights in Scranton, even though NBI's club was at the time playing in Waterbury rather than Scranton. McGee expressed at this time his view that the league had no such rights.

The Indemnification Committee met in November of 1985 and discussed various criteria for determining the amount of indemnification that NBI should pay if it elevated to Triple-A. The committee discussed a possible range of $50,000 to $250,000, within which the criteria would be used to set an exact amount, but the committee did not finally agree on a recommendation to the league as a whole. The committee met again in December of 1985. Revo asked if NBI would agree then and there to pay the Eastern League $200,000 at such time in the future as Scranton elevated to Triple-A; McGee refused. The committee again failed to agree on a recommendation to the league.

In June of 1986, McGee approached Jordan Kobritz, a general partner of Triple-A Baseball Club Associates, a Maine Limited Partnership ("the Limited Partnership"), about the possibility of purchasing the Maine Guides, a franchise in the Triple-A International League, and selling NBI's Double-A franchise. The Triple-A franchise would move to Scranton and the Dou-

ble-A franchise would move to Maine. McGee offered Kobritz the Double-A franchise plus $400,000 for the Triple-A franchise. Kobritz said that $400,000 was not enough. McGee also discussed his intentions with regard to the stadium to be built by MPSA in Scranton.

In July of 1986 McGee increased the cash portion of his offer to 2 million dollars. McGee told Kobritz he felt that the Eastern League had no territorial rights to Scranton but that the League might nevertheless seek money in connection with the proposed transfer. On July 30, McGee forwarded to Kobritz a $100,000 deposit and drafts of two agreements, one providing that NBI would buy the Triple-A franchise from the Limited Partnership for $2.4 million and the other providing that Kobritz individually would buy NBI's Double-A franchise for $400,000. Kobritz never signed these agreements; he retained the $100,000 check without depositing it.

On August 20, Kobritz forwarded to McGee a draft agreement between NBI and the Limited Partnership, Kobritz as general partner, and Triple-A Baseball Club of Maine, Inc., the other general partner. (Kobritz is the sole shareholder of his general partner Triple-A Baseball Club of Maine, Inc.) The net effect of the agreement was to transfer the Double-A franchise and $1.2 million from NBI to the Limited Partnership, to transfer the Triple-A franchise from the Limited Partnership to NBI, and to transfer $800,000 from NBI to the general partners. Kobritz intended to use some of that $800,000 to buy out those of his limited partners who were not interested in operating a Double-A franchise. This agreement contained four "conditions precedent": the approval by September 11, 1986 of the NBI board, Kobritz's limited partners, the International League, and the Eastern League. The agreement also made the transfer of the Triple-A franchise expressly contingent upon receipt of the Double-A franchise. Kobritz obtained his limited partners' approval of this agreement on August 24, but McGee never signed the agreement.

Late in August, Kobritz and McGee agreed to contact their respective league presidents to discuss seeking approval of the two franchise transfers as required by the league constitutions. On August 28, both McGee and Kobritz called International League president Harold Cooper, informing him that an agreement had been reached. Kobritz told Cooper that he and McGee had a "firm understanding" and he requested that Cooper call a special meeting of the International League so that the franchise could be transferred. Kobritz said he needed the meeting as soon as possible so that a player development contract could be signed with the Philadelphia Phillies. Cooper was not informed about any of the specific terms of the deal between Kobritz and McGee. Cooper scheduled an International League meeting to approve the sale for September 9 in Rochester, New York.

On August 29, 1986 McGee informed Eastern League president Eshbach that NBI had reached an agreement with Jordan Kobritz and the Limited Partnership involving the transfer of the Double-A franchise to the Limited Partnership and the Triple-A franchise to NBI. Eshbach advised McGee to submit a formal written request (1) that the Eastern League approve the transfer of the Double-A franchise to Kobritz or the entity he represented and (2) that the Eastern League permit NBI to "elevate" from Double-A to Triple-A. Eshbach also informed McGee that the Indemnification Committee would have to meet to discuss the issue, at which point McGee asked to be removed from the committee to avoid a conflict of interest. Eshbach agreed to do so and subsequently appointed Ben Bernard of the Albany franchise to replace McGee on the committee. Also on August 29, Kobritz called Eshbach, who told Kobritz that he would call a special Eastern League meeting at which Kobritz would make a presentation to the league, league members would ask him questions, and then would vote on the transfer. Eshbach said that the meeting would probably be on September 6. Also on August 29, Kobritz held a press conference to announce the sale; on McGee's

instructions, he identified the purchaser of the Triple-A franchise as MPSA.

McGee drafted a letter to Eshbach and read the draft to International League president Harold Cooper on August 30 or 31. Cooper had just recently talked to Johnny Johnson, president of the National Association (the governing body of minor league baseball). Johnson had told Cooper that there was a dispute over whether Scranton was Eastern League territory, that he (Johnson) was not familiar with all the facts of the case, that he had never ruled on the question, and that no "exception" had been granted under Section 10.-06(b) giving the Eastern League or NBI territorial rights in Scranton.[4] After McGee read Cooper the draft letter, Cooper told McGee that in his view Scranton was open rather than Eastern League territory; he reported that Johnson had said no exception had been granted covering the Scranton situation. Cooper also told McGee that the Scranton territorial issue had to be resolved before the September International League meeting called to consider Kobritz's request to approve the transfer of the Triple-A franchise to NBI. Cooper wanted to avoid the inter-league friction that would be created by the transfer of an International League team into territory as to which the Eastern League had an unsatisfied territorial claim.

On September 1, 1986, McGee sent the letter to Eshbach requesting that the Eastern League approve the sale of the Double-A franchise to Kobritz or an entity in which Kobritz had or would have an interest. McGee stated that he had an agreement to purchase Kobritz's Triple-A franchise and move it to Scranton. He noted that although in his view Scranton was not Eastern League territory, if the Eastern League believed that it was and if the National Association had so determined, then the letter should also be treated as a request to "elevate" to Triple-A. Because the question was open, McGee's letter continued, it was inappropriate at that time to enter into an indemnification agreement with the Eastern League; instead, he recommended "that the Eastern League determine an amount which it deems equitable and then ask the National Association to rule on the amount of damages should the National Association make a determination that Scranton is Eastern League territory."

On August 31 and September 1 Eshbach called the other Indemnification Committee members to set up a meeting for September 4, and he tentatively arranged a full Eastern League directors meeting for September 6 to consider the formal written request he anticipated receiving from McGee. Eshbach told the league directors what little he knew about the terms of the Kobritz-McGee deal, including the fact that the deal involved the transfer of the Double-A franchise to Maine. None of the directors expressed reservations about approving the transfer to Maine; their only concern was the need to resolve the indemnification issue with NBI. On September 1 Eshbach spoke to Kobritz, telling him of the Eastern League meeting tentatively set for September 6, discussing with him what to expect at the meeting, and advising him of the issues that Eshbach thought the Eastern League would want addressed regarding who would own the franchise, where it would play, and the status of a rumored dispute between Kobritz and some of his limited partners.

On September 3, McGee and Robert Tambur, a member of the NBI board, flew to Portland to finalize the terms of the agreement with Kobritz. They proceeded directly to the office of Richard Spencer, Kobritz's attorney; McGee showed Kobritz a copy of McGee's September 1 letter to Eshbach discussing the territorial rights dis-

---

**4.** Section 10.06(b) permits the National Association president and Executive Committee to grant "exceptions" to the territorial rights rule after giving notice and an opportunity to be heard to all affected leagues and clubs. The grounds for granting such exceptions are not stated. But the parties agree that the impending move of a franchise into a city might provide grounds for granting an exception to the rule that a franchise must "operate" in a city made to establish territorial rights therein. Thus either NBI or the Eastern League could have requested recognition of their territorial rights in Scranton even though NBI operated its franchise in Waterbury, Connecticut.

pute, mentioning indemnification damages, and requesting Eastern League approval of the transfer of the Double-A franchise. McGee also showed Kobritz documents indicating MPSA's involvement in financing the deal. Before Spencer entered the room, Kobritz said that there might be a problem in securing Eastern League approval of the transfer of the Double-A franchise to the Limited Partnership because of dissent that had arisen among some of his limited partners. These dissenters did not want to operate a Double-A team and were challenging the legal validity of the August 24 limited partners' vote approving the August 20 agreement. The dissenters opposed that agreement because it made the sale of the Triple-A franchise expressly contingent upon acquisition of a Double-A franchise by the Limited Partnership. The dissenters were making public statements that were uncomplimentary to the Eastern League. Kobritz stated that if the Eastern League refused to approve the transfer of the Double-A franchise to the Limited Partnership, he wanted a side agreement whereby he would acquire the Double-A franchise individually and then operate it with those of his limited partners who wanted to do so. Kobritz felt a side agreement assuring his individual acquisition of the Double-A franchise was necessary because the dissenters would not approve the main agreement if it appeared to assure that the Limited Partnership would be acquiring a Double-A franchise. McGee and Tambur stated that they had no objections to such an arrangement. Neither McGee, Tambur, nor Kobritz considered the possibility that the Eastern League might not approve the transfer for reasons other than the dissent among the limited partners—*e.g.*, because of the territorial rights dispute.[5]

Spencer then brought in a new draft agreement that provided for NBI to purchase the Triple-A franchise for $2.4 million and the Limited Partnership to purchase the Double-A franchise for $400,000. Unlike the August 20 draft, however, this agreement did not make the transfer of the Triple-A franchise expressly contingent upon the transfer of the Double-A franchise to the Limited Partnership. Instead, the new agreement provided that if the Eastern League "shall refuse to approve the sale" to the Limited Partnership, the agreement would "remain in full force and effect;" the sale of the Triple-A franchise would nevertheless go through, but NBI would pay $2 million instead of $2.4 million to the Limited Partnership. By "refuse to approve the sale" the Court finds that the parties meant "refuse to approve the sale on its merits." The new agreement also dropped "approval of the Eastern League by September 11" from the list of "conditions precedent" in the August 20 draft; instead, the new draft merely stated that the transfer of the Double-A franchise was subject to Eastern League approval. Because of these differences, the new draft also required the approval of the Limited Partners; Kobritz hoped the changes would satisfy the dissenters and render moot any dispute over the legal validity of the August 24 limited partners' vote approving the August 20 draft. McGee asked that the closing date on the new draft be changed from September 14 to October 21, to allow him sufficient time to obtain $2 million in public financing with which to purchase the Triple-A franchise. Kobritz agreed to this change. Kobritz did

**5.** At trial, Kobritz testified that this discussion took place at the Portland Jetport before the group left for Spencer's office. Tambur testified that it took place in Spencer's office before Spencer entered with a new draft of the main agreement. McGee testified that it took place after the parties signed the main agreement and Spencer left the office. The Court credits Tambur's and McGee's testimony that there were no substantive discussions at the Jetport, but credits Tambur's and Kobritz's testimony that the discussion occurred before the signing of the main agreement. The Court does so because Tambur's demeanor and less direct involvement in the litigation made him more credible and because on the more important issue of when (rather than where) the discussion took place, Tambur's version is against NBI's interest and thus is more credible than McGee's version. Finally, McGee's testimony on the question was somewhat contradictory; at one point he testified that Kobritz asked McGee about the side agreement "on the morning of September 3" which would place the conversation prior to Spencer's presentation of the new draft of the main agreement.

not ask that the draft be changed to provide for NBI to pay $2.4 million even if the Eastern League refused to approve the transfer of the Double-A franchise to the Limited Partnership.[6]

Spencer left the room and Kobritz began drafting the side agreement between himself individually and NBI. The draft recited that NBI had recently entered into an agreement to purchase the Limited Partnership's Triple-A franchise and that the Limited Partnership had recently entered into an agreement to purchase NBI's Double-A franchise. It further recited that "Whereas [NBI] and [Kobritz] agree to use their best efforts to obtain Eastern League approval of the purchase by [the Limited Partnership] of [NBI's] Double-A franchise; and Whereas, if even after using their best efforts to obtain such approval the Eastern League shall fail to approve the purchase of [NBI's] Double-A franchise by the [Limited Partnership]," the side agreement would become effective. Under the side agreement, Kobritz would purchase the Double-A franchise from NBI for $500,000; NBI would hire Kobritz as a consultant for a fee of $500,000. (The Court finds that the parties intended the words "fail to approve" to have the same meaning as the words "refuse to approve" in the September 3 main agreement.) Because the two payments canceled each other, the stated price was irrelevant to the

net effect of this agreement. McGee had suggested, therefore, that the franchise be assigned a value of $500,000 (rather than the $400,000 specified in the main agreement); he believed that the Eastern League directors would be pleased to see one of their league's franchises valued so highly and would thus be more likely to approve the transfer to Kobritz.[7]

Spencer returned to the room with a new copy of the agreement between NBI and the Limited Partnership, incorporating the modifications agreed upon earlier in the meeting. The parties signed both the main and side agreements and McGee and Tambur returned to Scranton. Kobritz then assigned his rights under the side agreement to the Limited Partnership in order to make clear, should any question arise, that he was acting in the Limited Partnership's rather than his own interest. At a limited partners meeting that evening, Kobritz presented the main agreement in detail and described the side agreement in general terms as a guarantee that the Limited Partnership would enjoy the financial benefits of ownership of the Double-A team. Kobritz did not go into detail because he feared that the dissenters would view the two agreements and the assignment, taken together, as equivalent to the August 20 draft agreement which they had opposed. The limited partners then approved the

6. McGee testified that Kobritz made such a request, to which McGee claims he responded that he could go no higher because he could only obtain $2 million in public financing. McGee's theory is that Kobritz preferred selling the Triple-A franchise for $2.4 million in cash rather than a net $2 million plus a Double-A franchise; McGee thus seeks to establish that Kobritz did not really want the Double-A franchise. But Tambur testified that Kobritz never asked to change the price from what had been discussed earlier, i.e., a net price of $2 million. For the reasons previously stated, the Court credits Tambur's testimony. Moreover, because the Court has found that McGee and Tambur had at this point not objected to Kobritz's proposal for a side agreement under which he would acquire the Double-A franchise, it is unlikely that Kobritz would suddenly ask for an additional $400,000 out of the deal as a whole. At this point the Court finds that the net terms of the deal were (as they had been at least as early as July 30) intended to be $2 million plus the

Double-A franchise in exchange for the Triple-A franchise, although no one knew whether the Double-A franchise would initially be transferred to the Limited Partnership or to Kobritz individually.

7. Kobritz testified that he drafted this side agreement during the previous discussion, before Spencer entered the room. Tambur testified that Kobritz drafted the agreement after Spencer left the room. The Court credits Tambur for the reasons previously stated and for the following additional reason. If the discussion of valuing the Double-A franchise at $500,000 had occurred before Spencer brought in the draft of the main agreement, it appears likely that the parties would have changed (or at least discussed changing) the value assigned to the Double-A franchise in the main agreement as well. The parties' failure to do so suggests that they discussed revaluing the franchise, and thus drafted the side agreement, only after discussing the main agreement.

main agreement by a show of hands and later by a written vote.

As they returned to Scranton on September 3, McGee and Tambur discussed modifying the side agreement to clarify what might happen if the Eastern League refused to approve the transfer to Kobritz individually. They had no specific reason to believe that such a refusal might occur, other than that the dissent among Kobritz's limited partners might somehow adversely affect the league's view of Kobritz individually. But McGee and Tambur nevertheless felt that the side agreement should be modified to provide Kobritz with a consulting fee in the event the Eastern League refused to approve the transfer to him individually. They felt that such a provision would also make the September 3 agreement with the Limited Partnership clearer and more final.[8]

Early on September 4, Eshbach received McGee's letter of September 1. Eshbach wrote to International League president Cooper telling him of the Eastern League's position that Scranton was Eastern League territory and requesting that the International League refrain from acting pending Eastern League action on the dispute with McGee. Eshbach also wrote to McGee reiterating the Eastern League's position that it had territorial rights in Scranton and informing McGee that the Eastern League was "withholding its permission for the Scranton club to elevate to Triple-A, pending further discussions and agreement on the issue of indemnification." The letter also noted that an Indemnification Committee meeting was scheduled for that night (September 4) and that Eshbach would brief McGee on any progress; Eshbach stated that he hoped an agreement could be reached by the following week and finalized at an Eastern League meeting.

On September 4, Tambur called Kobritz and suggested that the side agreement be changed to provide Kobritz with a consulting fee in the event the Eastern League refused to approve the transfer to him indi-

vidually. Kobritz asked, "What do you know that I don't know?" Tambur replied that there was nothing, that he and McGee merely felt Kobritz needed additional protection. Kobritz asked to talk to McGee before agreeing to any modifications.

McGee then called Kobritz, who asked what was going on. McGee said, "Nothing." Kobritz asked why McGee wanted to modify the side agreement; McGee explained that he wanted to provide for a consulting fee to Kobritz in case of Eastern League nonapproval so that the NBI board, at its meeting scheduled for September 5, would not view the deal as potentially void (*i.e.*, for want of consideration). At 2:24 p.m. McGee transmitted a facsimile of ("faxed") the side agreement with proposed modifications to Kobritz, asking Kobritz to call back if he had questions.

Eshbach's wife left a message with McGee's office at 3:18 p.m. on the afternoon of September 4 notifying McGee that the Eastern League meeting tentatively scheduled for September 6 had been postponed and that Eshbach would be in touch. Eshbach left a similar message at Kobritz's office.

Kobritz then called McGee, asking why the Eastern League meeting had been canceled. McGee replied that he had received a similar message from Eshbach but that he did not know the reason for it. Kobritz asked if the modifications to the side agreement changed the deal in any way; McGee replied that they did not. Kobritz again asked if there was anything he should be aware of and McGee replied, "Not that I know of." (The Court finds that at this time neither Kobritz nor McGee knew or reasonably should have known that the Eastern League would not approve the transfer to Kobritz individually or that the Eastern League would demand that NBI relinquish the franchise to the league.) Kobritz made some minor modifications clarifying how he would be paid his con-

---

**8.** The Court infers, and finds as fact, that McGee and Tambur wanted to insure that Eastern League nonapproval of the sale to Kobritz would not render the main September 3 agreement, under which NBI would acquire the Triple-A franchise, void for want of consideration.

sulting fee.[9] This side agreement express-ly superseded the side agreement signed on September 3. It was identical to the September 3 side agreement in most respects, including the "best efforts" language and other recitals and the agreement that if the Eastern League failed to approve the transfer to the Limited Partnership, NBI would sell the franchise to Kobritz for $500,000 and would pay Kobritz a consulting fee of $500,000. But the September 4 side agreement provided for an additional contingency: that in the event the Eastern League "denie[d] approval" of the sale not only to the Limited Partnership but also to Kobritz individually, NBI would reduce Kobritz's consulting fee, but not below $400,-000, by the amount of indemnification damages if any that NBI was required to pay to the Eastern League. (The Court finds that the parties intended the words "denie[d] approval" to have the same meaning as the words "refuse to approve" in the September 3 main agreement.) The September 4 side agreement was made expressly contingent upon NBI's acquisition of the Triple-A franchise from the Limited Partnership. Kobritz signed the agreement and "faxed" it back to McGee at 3:28 p.m., at which time McGee also signed it. Kobritz then assigned to the Limited Partnership his rights under the September 4 side agreement.

At 4:40 p.m. on September 4, Kobritz called Eshbach to ask why the Eastern League meeting of September 6 had been canceled. Eshbach replied that there was a two-part problem, the first part of which he did not identify but said needed to be resolved before the Eastern League could consider the second part—approval of the transfer of the Double-A franchise to Maine. (By the "first part" of the problem Eshbach meant the territorial rights indemnification issue.) Kobritz asked if the first part of the problem directly affected him or the transfer of the Double-A franchise to

Maine, and Eshbach responded that it did not.

At 4:58 p.m. on September 4, the Eastern League Indemnification Committee met by conference call; participating were Bernard, Mileur, Revo, and Eshbach. The members expressed strong opposition to permitting Scranton to elevate to Triple-A; they felt that the Eastern League had expended time and effort in assisting NBI, that the proposed Scranton stadium would be the flagship facility of the league, that Scranton fit well with the league geographically, and that Scranton's elevation would hurt the league's reputation. The members felt that McGee's September 1 letter to Eshbach disputing the Eastern League's territorial rights was not in good faith, given that McGee had requested permission to explore elevation to Triple-A, had previously served on the Indemnification Committee, and in the members' view had previously offered to settle.

Mileur then suggested that the Eastern League withhold permission for Scranton to elevate to Triple-A unless Scranton relinquished its Double-A franchise to the Eastern League. The Eastern League would then sell the franchise to a new owner of its choice and either divide the proceeds among the remaining member franchises or use the proceeds for league purposes. This would not only compensate the league for losing the Scranton territory but also give the league ultimate control over the placement of the franchise in a new city with a new owner. The committee instructed Eshbach to seek full Eastern League approval by phone of the following two-part response to the request contained in McGee's letter of September 1. First, the league would not consider any proposed transfer of NBI's Double-A franchise unless NBI first satisfied the Eastern League's right to indemnification for the loss of the Scranton territory. Second, the Eastern League would not give NBI permission to elevate to Triple-A unless NBI

---

9. The Court does not credit Kobritz's testimony that these changes were meant to reflect his intent that the consulting fee was not a substitute for the transfer of the Double-A franchise. If Kobritz had desired at the time to make his preference for a Double-A franchise clearer than it already was, he would have done so using more explicit language. The changes he did make do not reflect such an intent.

relinquished its Double-A franchise to the Eastern League as such indemnification. The committee meeting ended without any substantial discussion of the merits of Kobritz or the Limited Partnership as potential owners or the merits of Maine as a potential location of the Double-A franchise. At least one committee member, Revo, felt that focusing on indemnification by NBI and refusing to even consider the proposed transfer to Maine might be a way to keep Scranton in the Eastern League while at the same time reducing the chance of the Eastern League being sued by Kobritz or the Limited Partnership.

Before the September 4 Indemnification Committee meeting, the idea of franchise relinquishment as indemnification had been raised only once, in passing, in a conversation in August between Eshbach and Mileur. Until the September 4 meeting no one in the Eastern League seriously considered franchise relinquishment as an option in dealing with NBI, and neither McGee nor Kobritz was aware that relinquishment was even a possibility until after September 4. Such a demand is unprecedented in minor league baseball.

Between September 5 and 7 Eshbach attempted to contact the other Eastern League directors to obtain approval for the Indemnification Committee's recommended response to McGee's September 1 request. On September 6 Eshbach phoned McGee and told him of the committee's recommendation. This was the first McGee had heard of relinquishment; he was shocked and promised to get back to Eshbach. Later on September 6 McGee phoned Cooper, told him of the Eastern League's position, and asked for National Association president Johnson's home phone number. Cooper gave McGee the number and told McGee once again that the International League viewed Scranton as open territory.

By September 7 Eshbach had obtained the approval of all the Eastern League directors (other than McGee) and called McGee again to tell him that the league's demand for franchise relinquishment was official. McGee responded with a two-pronged offer: Scranton would either (1)

pay $250,000 to the Eastern League and agree not to appeal to the National Association the questions of the existence of territorial rights to Scranton or the appropriate amount of indemnification or (2) agree to seek a National Association determination of territorial rights to Scranton and not on the question of the amount of indemnification; if the National Association decided that Scranton was not Eastern League territory, NBI would nevertheless pay $100,000 to the Eastern League. McGee told Eshbach that he needed the indemnification dispute decided before the International League met on September 9 to consider the proposed transfer of the Triple-A franchise to Scranton; Cooper had told McGee that Scranton would have to be open territory in order for the International League to approve the transfer.

On September 8 the Indemnification Committee met again by conference call and Eshbach reported McGee's two-pronged offer. There was no discussion of the merits of the transfer to Maine, of asking McGee for more than $250,000, or of how to respond if he made a higher offer. In light of the Eastern League directors' unanimous (excepting McGee) endorsement of the Indemnification Committee's recommendation, and the directors' feeling that there was no serious basis for asserting that Scranton was not Eastern League territory or for submitting the question to the National Association, the committee instructed Eshbach to inform McGee that the Eastern League's position was nonnegotiable.

At noon on September 8 McGee called National Association president Johnson. McGee asked what effect submission of the territorial rights question to the National Association would have on the International League's expected September 9 approval of the transfer of the Triple-A franchise to Scranton. Johnson replied that if the issue were submitted to him, the International League's approval of the transfer of the Triple-A franchise to Scranton would not be given any effect unless and until Johnson determined that Scranton was open rather than Eastern League territory. McGee told Johnson that the International League

viewed Scranton as open territory; Johnson was already aware of the two leagues' respective positions, including the Eastern League's position that NBI should relinquish its Double-A franchise as indemnification. Johnson stated that, based on what he had been told about the terms of NBI's admission to the Eastern League— *i.e.*, that the team was a Scranton team with a two-year holding period in Waterbury until the Scranton stadium was complete—that no exception under Section 10.-06 would be necessary to make Scranton Eastern League territory. Regarding the amount and type of indemnification, Johnson said that the Buffalo and Nashville monetary settlements were distinguishable and that he was sure that somewhere in the National Association Agreement he could find authority to force relinquishment of a franchise as indemnification for a loss of territorial rights. McGee had not (in fact, never) examined Section 10.06 of the National Association Agreement, one of the two sections most germane to these questions. Nor was McGee aware of any provision of that Agreement giving the Eastern League the right to demand that he relinquish his franchise as indemnification for territorial rights.

At about 2:30 p.m. on September 8, McGee met with Eshbach, who informed him that the Eastern League had rejected McGee's two-pronged offer. McGee asked Eshbach how much cash it would take to resolve the problem without relinquishing the franchise. McGee also asked whether, if the National Association were asked to decide and did decide that Scranton was not Eastern League territory, the Eastern League would then be inclined to approve the transfer to Kobritz and the Maine group. Eshbach replied that he could not guarantee such approval because there were other locations, such as Harrisburg, Pennsylvania, that were more attractive to the Eastern League than Maine. Finally,

McGee asked Eshbach to write a letter stating that the Eastern League refused to approve the transfer of the Double-A franchise to Maine; McGee wanted something in writing to give to Kobritz the next day. Eshbach and McGee began drafting the letter; Eshbach then called Revo, who asked if McGee would still have a deal with the Limited Partnership if he could not transfer the Double-A franchise. Eshbach relayed this question to McGee who answered in the affirmative, showing Eshbach the alternative cash provision in the September 3 agreement. Eshbach relayed this to Revo, who then advised Eshbach not to give McGee the requested letter. Eshbach then put McGee on the line, and McGee told Revo that he wanted to settle the matter by paying the Eastern League money. Revo responded that the Eastern League wanted the franchise rather than money, and McGee said that Eshbach had been telling him the same thing. Revo also told McGee that the Eastern League wanted NBI to agree to hold the league harmless in the event of a suit by Kobritz or the Limited Partnership based on the league's actions in blocking the transfer.[10]

At 7:00 a.m. on the morning of September 9, before the International League meeting, McGee telephoned Eshbach and agreed that NBI would relinquish the Double-A franchise to the Eastern League, but McGee said he had no authority to agree to hold the league harmless against a suit by Kobritz or the Limited Partnership. McGee asked Eshbach to attend the NBI board meeting scheduled for the evening of September 10, present the league's demand to be held harmless, and allow NBI to make another attempt to get the league to accept a cash settlement.

McGee agreed to relinquish the franchise because of five factors. First, he believed the Eastern League would not accept a cash settlement of the territorial rights dis-

10. At trial the Court sustained hearsay objections to questions designed to elicit from McGee his version of the conversations with Eshbach and Revo. Upon reflection the Court is of the view that McGee's testimony should have been permitted for the limited purpose of establishing his state of mind just before he decided to relinquish the franchise. Such testimony could not, however, have been relevant to the existence or nonoccurrence of the implied condition precedent on which the Court bases its disposition of the merits of the dispute between NBI and the Limited Partnership.

pute. Second, he believed that even if the dispute could be settled with cash, the Eastern League would not approve the transfer to the Limited Partnership or to Kobritz because the league preferred locations other than Maine. Third, he believed the Eastern League would take any action necessary, including litigation or arbitration before the National Association, to enforce its territorial rights claim; in view of these possibilities, McGee felt he could not issue a "no threat of litigation" opinion letter, required to obtain the $2 million in public financing to purchase the Triple-A franchise, unless he settled the Eastern League's claim. Fourth, McGee believed it would be fruitless to seek a National Association determination on the territorial rights question, because he believed that Johnson had already made up his mind both that Scranton was Eastern League territory and that forced franchise relinquishment was authorized by the National Association Agreement. Fifth, McGee believed that the International League would not approve the transfer of the Triple-A franchise to Scranton at its September 9 meeting unless he could represent to the league that he had settled the Eastern League's claim of territorial rights to Scranton.

McGee met with Cooper on the morning of September 9 before the International League meeting and told Cooper that he had bad news for Kobritz: NBI could not deliver a Double-A franchise to Kobritz because it was relinquishing the franchise

to the Eastern League as indemnification. Cooper asked whether that affected McGee's deal to acquire the Triple-A franchise from Kobritz; McGee responded that it did not because of the alternative cash provision. Cooper replied that in that case it was a private matter between McGee and Kobritz and he would therefore not raise it at the International League meeting. By this time Cooper had received Eshbach's September 4 letter asserting that Scranton was Eastern League territory, noting that the Eastern League was working with McGee regarding his desire to elevate, and asking the International League not to act until the Eastern League had acted.

After this conversation with Cooper, but before the International League meeting, McGee met with Kobritz at breakfast. McGee told Kobritz that the Eastern League had rejected his offer of $100,000 (the second prong of McGee's two-pronged offer) and had asked him to relinquish the Double-A franchise instead. McGee mentioned a $250,000 figure and told Kobritz that he would try to get the NBI board to offer a cash settlement to Eshbach so that Kobritz could get the Double-A franchise. But McGee said that in order to get the Scranton territory open in time for the International League meeting, he had told Eshbach that he would relinquish the Double-A franchise. McGee also told Kobritz that there were locations other than Maine where the Eastern League would like to have a Double-A franchise.[11]

11. The McGee and Kobritz versions of this conversation differ as to numerous particulars; the summary given in the text is consistent with both versions except that Kobritz denies that McGee said he had agreed to relinquish the franchise to Eshbach. For two reasons, the Court credits McGee's testimony that he did tell Kobritz of his agreement to relinquish the franchise.

First, Kobritz asserts that had he been told before the International League meeting of McGee's intent to relinquish the franchise, he (Kobritz) "would not have gone through with the approval meeting on that date." Yet Kobritz acknowledges that McGee told him before the meeting that the Eastern League had turned down a $100,000 cash offer, that there was no definite agreement on whether the Eastern League would accept a higher figure or on

whether NBI could itself offer a higher figure, that the Eastern League had locations other than Maine where it would like to place a Double-A franchise, and that the Eastern League *was demanding* that NBI relinquish the Double-A franchise. In spite of this uncertainty, at the outset of the International League meeting Kobritz proceeded to ask the International League to approve the transfer.

It was not until later in the meeting that McGee said he felt he had satisfied the Eastern League's claim and that one James Baumer of the Philadelphia Phillies announced the Phillies' willingness to contribute money to enable NBI to reach a monetary settlement with the Eastern League. (The Phillies wanted a Triple-A franchise in Pennsylvania with which to affiliate and thus were willing to help NBI in its effort to acquire such a franchise for Scranton.) Kobritz claims he understood the McGee and Baumer

Cooper opened the September 9 meeting by saying that the league was going to vote on the transfer of the Maine franchise from Old Orchard Beach to Scranton. He then turned the meeting over to Kobritz who said that the parties had "in effect, worked out an arrangement that is, I think, satisfactory to both parties individually and now I think it's a matter that is in order for presentation to the league for its approval." Cooper raised the issue of territorial rights over Scranton by saying that the league believed Scranton to be open territory but that "whatever might happen between Scranton and the Eastern League is their business, not the International League's business." He insisted that the league include in its motion approving the sale a provision that the International League would be held harmless for any claims or damages that arise and that NBI assume any such liability. McGee, in response to questioning by Cooper, indicated

that he believed that he had satisfied the Eastern League; Kobritz remained silent throughout this conversation. The terms of the agreement between Kobritz and McGee were never discussed and Kobritz's initial statement that the parties had "worked out an arrangement ... that is in order for presentation to the league for its approval" was never modified or contradicted. Immediately after the vote approving the assignment (upon McGee's request, to MPSA rather than NBI), the league members voted to move the franchise from Maine to Scranton. Kobritz, who still had not indicated that his deal with McGee was anything less than final, did not make any comment at this point suggesting that it was premature to move the franchise because he was still the owner. The league then turned to a discussion of the 1987 schedule and it was suggested that they might approve a schedule as early as Octo-

comments to mean that, in the time between Kobritz's and McGee's breakfast meeting and the International League meeting, Baumer had agreed to contribute enough money so that McGee could tell the International League that he had satisfied the Eastern League's claim. But the Court does not find plausible Kobritz's *post hoc* interpretation of these remarks, because Kobritz twice testified that he was unsure whether McGee had said he had already *offered* $250,000 or whether McGee said he thought the Eastern League would *accept* $250,000. Even if the Court did not find as fact (as it does) that McGee actually told Kobritz the Eastern League had rejected his $250,000 offer, Kobritz's acknowledged uncertainty over whether the Eastern League would accept $250,000 (or any cash settlement) makes it unlikely that Kobritz interpreted the McGee and Baumer comments alone as a sure sign that there would be a cash settlement with the Eastern League. And Kobritz does not suggest that he believed McGee had called Eshbach and reached a firm cash settlement at any time before or during the International League meeting. Nor did Kobritz at any time ask McGee to explain his comment that he had satisfied the Eastern League.

The Court therefore finds that by the time the International League voted on the transfer of the Triple-A franchise, Kobritz knew or reasonably should have known of the possibility that the Eastern League would insist on relinquishment and refuse to accept cash. Kobritz nevertheless did not ask the International League to disapprove the transfer, postpone the vote, or make the approval contingent on a successful cash settlement with the Eastern League. The McGee/Baumer comments at the International League meeting and Kobritz's lack of reaction

to them are therefore more consistent with McGee's version of the breakfast meeting than with Kobritz's version.

Second, both McGee and Cooper testified, and the Court has found as fact, that McGee told Cooper just prior to the International League meeting that McGee had agreed to relinquish the Double-A franchise to the Eastern League. McGee testified, and the Court has found, that Cooper agreed not to raise the relinquishment matter at the International League meeting because in his view it was a private matter between McGee and Kobritz. Cooper's conduct at the International League meeting corroborates these findings; twice, in response to direct questions to Kobritz about whether he was getting the Double-A franchise, Cooper tried vigorously to steer the meeting away from any discussion of the subject. The Court finds it unlikely that McGee, if he had wanted to conceal from Kobritz his agreement to relinquish the franchise, would have told Cooper of his agreement to do so; the risk to McGee that Cooper might then tell Kobritz would be too great. It may be, as Kobritz testified, that before the meeting Cooper mentioned to Kobritz his understanding that the Eastern League was asking for money, without mentioning the Eastern League's demand for relinquishment. But what Cooper may in fact have told Kobritz did not alter the risk to McGee that Cooper, knowing McGee had agreed to relinquish, might mention this to Kobritz, whether before, during, or after the International League meeting. It thus appears likely that McGee told Kobritz as well as Cooper of his agreement to relinquish the franchise.

ber. Kobritz did not speak up at this point and state that his deal was not final and that, therefore, scheduling should be delayed until it was certain who would own the eighth franchise. Cooper referred to the Scranton representatives as the "new owners" and Kobritz did not object to this designation. Kobritz did, however, respond to an invitation to attend the league's next meeting in late September by mentioning that he wouldn't be a member "beyond that date," suggesting that he, at least, considered himself to still be a member.

Eshbach attended the NBI board meeting on the evening of September 10. He told the board that the Eastern League would only approve NBI's elevation to Triple-A if NBI relinquished the Double-A franchise to the Eastern League as indemnification. Eshbach said that if NBI refused to agree, there would be a lengthy appeal to the National Association. Without offering any specific amounts, NBI board members asked if the Eastern League would accept a cash settlement; Eshbach responded in the negative, explaining that the league wanted the Double-A team to either stay in Scranton or be relinquished to the league. When asked if the league would approve the transfer to Kobritz, Eshbach responded that the league would not approve the transfer to anyone. Eshbach also told the NBI board that both he and National Association president Johnson considered Scranton to be Eastern League territory. Neither Eshbach nor McGee raised the issue of the Eastern League's demand to be held harmless in case of a lawsuit by Kobritz or the Limited Partnership. Eshbach then left the meeting and there was further discussion, little or none of which focused on NBI's contractual obligations to Kobritz or the Limited Partnership. McGee reported that Cooper viewed Scranton as open territory, but McGee pushed for a decision that evening. The NBI board then voted to relinquish the Double-A franchise and to waive its right to a determination of whether Scranton was Eastern League territory, both contingent upon NBI's acquisition of the Triple-A franchise by October 21, 1986.

The board also authorized McGee to make additional agreements with the Eastern League; McGee wanted this authority in the event that Eshbach renewed his demand for a "hold harmless" agreement.

On September 11, McGee hand-delivered a letter to Eshbach reciting his understanding that the Eastern League had refused to accept a cash settlement or to approve the transfer of the Double-A franchise to anyone other than the Eastern League itself. Although specifically refusing to admit that Scranton was Eastern League territory, the letter stated that NBI accepted what it characterized as the Eastern League's "offer" of permission to operate a Triple-A franchise in exchange for relinquishment of the Double-A franchise (contingent upon a successful closing with the Limited Partnership on October 21, 1986) and waiver of NBI's right, through litigation or arbitration, to obtain a determination of the territorial rights and indemnification questions.

McGee then called Kobritz and told him that the NBI board had agreed to relinquish the Double-A franchise to the Eastern League; McGee read Kobritz the letter that McGee had just given to Eshbach. McGee later sent a copy of the letter to Kobritz, who called McGee back on September 16 and said that based on McGee's letter, their deal was off.

On September 22, McGee and Eshbach entered a written agreement on behalf of NBI and the Eastern League. The Eastern League granted permission to NBI to elevate to Triple-A and enter the International League; the Eastern League waived its claim to territorial rights in Scranton. In exchange, NBI agreed to relinquish its Double-A franchise to the Eastern League and it waived its right to litigate or seek arbitration on the question of whether Scranton was Eastern League territory. NBI also waived its right to seek damages or specific performance, through litigation or arbitration, "based on the Eastern League's Board of Directors' refusal to approve the ownership transfer of [NBI's] franchise to any party or entity other than the Eastern League." Finally, NBI agreed

to indemnify the Eastern League against claims by third parties based on the league's actions with respect to the transfer. The entire agreement was made contingent upon NBI's acquisition of a Triple-A franchise and full payment therefor by October 21, 1986, failing which the agreement would be null and void.

Kobritz had no contact with the International League between September 9 and September 22. Although he had frequent contact with McGee during this period, and told McGee that there would be no deal without the transfer to him of the Double-A franchise that he now knew McGee had agreed to surrender to the Eastern League, Kobritz gave the International League absolutely no information about the developing crisis. On September 22 and 23, the International League met in Las Vegas. Kobritz waited until Cooper had entered the meeting room before telling him that there were serious problems with the Scranton deal, that he was still the owner of the franchise, and that he wanted to vote at the meeting. This was the first time that Cooper was informed by any party that the sale had not yet occurred and might in fact not go through. Cooper expressed to Kobritz his view that Kobritz was no longer a member of the league and therefore could not vote. Kobritz attended the two-day meeting, spoke on several issues, including an insurance issue that he believed was of importance to league members, but did not raise the matter of his dispute with McGee or whether or not he should still be able to vote as a league member.[12]

Kobritz approached Cooper after the final adjournment of the meeting on September 23, and requested that he reconvene the meeting so that he could place on the record his position that he was still a member of the league. Cooper declined to do so, saying that at least one member of the league had left town or was in the process

of leaving and that, in any case, McGee had sent a representative (NBI employee Bill Terlecky) to the meeting and was not present himself and that McGee should be present for any discussion of membership rights. Cooper did, however, offer to call a special meeting at which all parties would be present and the issue could be discussed.

On September 25, Kobritz sent a letter to Cooper in which, for the first time, he gave written notice that there had not yet been a sale to Scranton and that he still considered himself to be a league member and entitled to the privileges that attach to such a status. Cooper responded by calling Kobritz and renewing his offer to call a special meeting to discuss the matter. Kobritz responded by saying that he would think the offer over, but he later called Cooper and rejected it. On September 26, Cooper called McGee and asked him if he had an agreement with Kobritz; McGee replied that he did. Cooper asked McGee for a copy of the agreement and McGee sent one a few days later. When Cooper received the copy on October 1, it was the first time he learned of the actual terms of the arrangement and of the designated closing date.

On September 26, Kobritz again told McGee that unless NBI transferred the Double-A franchise at the October 21 closing, the Limited Partnership would not transfer the Triple-A franchise.

On October 20, NBI assigned to MPSA the September 3 agreement between NBI and the Limited Partnership with the proviso that NBI retained the right to enforce the agreement. NBI executed the assignment because it believed that the bond issue through which the new stadium was being constructed required that MPSA own a baseball franchise. In consideration of this assignment, MPSA assumed all of NBI's existing financial obligations relating to advanced ticket sales. MPSA and

---

**12.** Kobritz claims that Cooper forbade him from raising during the meeting his claim that he had a right to vote. Cooper denies this. The Court concludes, after reviewing the testimony of Cooper, Kobritz, and league vice-president David Rosenfield, and after reviewing a verbatim transcript of the September 9 meeting, at which Cooper's attempts to move the discussion away from certain topics were by persuasion rather than injunction and were largely unsuccessful, that Kobritz could have raised the issue if he had chosen to do so.

NBI agreed that NBI would actually operate the Triple-A franchise once acquired.

On October 21, McGee appeared at the scheduled closing, prepared to close under the alternative cash provision of the September 3 agreement between NBI and the Limited Partnership. McGee brought with him the closing documents that he had prepared on behalf of MPSA. When informed that no Double-A franchise would be transferred, Kobritz's attorney stated that the Limited Partnership would not transfer the Triple-A franchise, and the meeting ended.

On October 21, after the aborted closing, Kobritz called Cooper. Cooper advised Kobritz to request a special meeting of the league and request that the league rescind its action of September 9; he proposed that at such a meeting the league could hear all interested parties, examine documents, and decide who owned the franchise and whether a league vote of rescission was proper. Cooper said that under the circumstances a league meeting that had been called for Scranton would be moved to another city.

The following day Kobritz called Cooper and said that he would not request a special meeting because he was not being treated as a member of the league and therefore he did not have to comply with the league constitution. He reiterated his position that he felt that he was still a member. Cooper responded that he had decided to cancel the November meeting altogether and delay any league business until the winter meetings in December, thereby giving the parties to the contract dispute more time to work out a settlement. On October 30 Kobritz wrote to Cooper, informing him that he was filing suit against the league "to require the International League to seat Maine as a league member at the winter meetings in Hollywood, Florida on December 7, and to require the league to include Maine in the 1987 league schedule." Cooper responded with a letter on November 3, expressing his hope that the matter could be resolved prior to the Florida meetings and stating that he had suggested to Kobritz in early October that Kobritz request a special

meeting for the purpose of voting to rescind the action of September 9. He stated that in his opinion the minutes of the September 9 meeting were perfectly clear as to Kobritz's request that the league approve the sale and transfer of the Maine franchise to Scranton.

On November 26, Kobritz wrote to Cooper and requested that he be seated at the December 7 International League meeting in Florida. On December 1, Cooper wrote to Kobritz and indicated that he would be treated as a league member should he prevail in court in his contract dispute with Northeastern Baseball; on December 2, Cooper sent Kobritz copies of all information that had been mailed to International League members since the special meeting of September 9. Kobritz attended the winter meetings in Florida and was encouraged to comment on any issues of concern to him but was not allowed to vote. The schedule drafted at that meeting was designed to accommodate whichever party prevailed in the contract dispute.

## CONCLUSIONS OF LAW

### I. Personal Jurisdiction Over MPSA

Before trial, MPSA moved that all claims against it be dismissed on the ground that this Court lacks personal jurisdiction over it. With the consent of all parties, and to obviate the need for a separate evidentiary hearing, the Court reserved its ruling on this motion until after trial. Based on the evidence introduced at trial and the foregoing findings of fact, the Court now denies MPSA's motion.

Both the First Circuit and this Court have recently reviewed in depth the principles governing personal jurisdiction in diversity cases. See *Nicholas v. Buchanan*, 806 F.2d 305 (1st Cir.1986); *Terry L. Hopkins, Inc. v. Activation, Inc.*, 647 F.Supp. 748 (D.Me.1986). For present purposes, therefore, a brief review of those principles will suffice. Once the Court's personal jurisdiction is challenged, the burden is on the Plaintiff to establish that jurisdiction is proper; a showing of personal jurisdiction must be based on specific facts set forth in the record, which is to be construed in the

Plaintiff's favor. The limits of personal jurisdiction under Maine's long-arm statute, Me.Rev.Stat.Ann. tit. 14, § 704–A (1964), are co-extensive with federal due process requirements. The Court must therefore determine whether the assertion of personal jurisdiction over MPSA is authorized by Maine's long arm statute and is consistent with due process. This latter question involves a three-step inquiry: (1) whether MPSA has contacts with Maine; (2) whether the claims against MPSA relate to these contacts; and (3) if so, whether the relationship among MPSA, Maine, and the litigation forms a fair and reasonable foundation for the exercise of jurisdiction over MPSA. *See Terry L. Hopkins, Inc.,* 647 F.Supp. at 750.

Plaintiffs appear to assert that this court has long-arm jurisdiction under sections 704–A(2)(A) (transaction of business within Maine) and 704–A(2)(B) (causing the consequences of a tortious act to occur within Maine) of the long-arm statute. The Court agrees that long-arm jurisdiction is available under either of these provisions.

The Court concludes, first, that MPSA transacted business within Maine. The Court has found as fact that McGee was solicitor of the MPSA as well as president of NBI; McGee never clearly distinguished between his two roles during his dealings with Kobritz, the Limited Partnership, or the International League. MPSA was always intended as the ultimate owner of the Triple-A franchise; McGee and NBI thus acted as MPSA's agents in purchasing the franchise in Maine. During McGee's June, 1986 visit to Portland, McGee discussed his intentions with regard to the stadium to be built by MPSA in Scranton. McGee told Kobritz to announce at his August 29 press conference that the Triple-A franchise was being sold to MPSA. During McGee's September 3 visit to Portland, he showed Kobritz documents indicating MPSA's involvement in financing the deal. After NBI, on October 20, assigned to MPSA the agreement with the Limited Partnership, McGee returned to Maine for the October 21 closing, bringing closing documents prepared by him specifically on behalf of MPSA.

MPSA's assertion that McGee had no authority to act on its behalf while in Maine is simply specious.

Other events not occurring in Maine support the conclusion that Kobritz reasonably believed the transaction concluded in Maine involved MPSA as well as NBI. At the September 9 International League meeting in Rochester, New York, McGee made clear in Kobritz's presence that he represented both NBI and MPSA, that MPSA would own the Triple-A franchise, and that the International League should (as it did) approve the transfer to MPSA rather than to NBI.

The Court concludes, second, that MPSA committed acts that caused possibly tortious consequences within Maine. Plaintiffs' claim that MPSA converted their property is premised on MPSA's actions at International League meetings on September 22–23 and December 8 occurring outside of Maine. Because the International League had approved the transfer to MPSA rather than NBI, McGee's and NBI employee Bill Terlecky's participation in these meetings was clearly on behalf of MPSA. If MPSA's assertion of membership rights was tortious, then it interfered with the property rights of the Limited Partnership and/or its partners—rights that, if located anywhere, were located in Maine.

The foregoing is sufficient to establish that MPSA had contacts with Maine and that Plaintiffs' contract and conversion claims against MPSA relate to these contacts. The Court also concludes that Plaintiffs' fraudulent conveyance claim against MPSA relates to these contacts, because the conveyance grows out of MPSA's contacts with Maine in its capacity as the intended ultimate owner of the Triple-A franchise being purchased in Maine. The Court also concludes that MPSA's contacts with Maine relate to the claims asserted against MPSA by the International League; although these two entities had no actual contacts with each other that occurred in Maine, the claims all grow out of the agreement concluded in Maine for the transfer of the Triple-A franchise and the activities

in Maine of the other parties, including MPSA.

The remaining question in the due process analysis is whether the relationship among MPSA, Maine, and this litigation forms a fair and reasonable foundation for the exercise of jurisdiction over MPSA. The Court has no difficulty in concluding that this standard is satisfied. MPSA's agents came to Maine in an effort to purchase the Triple-A franchise; this litigation grows directly out of those efforts. MPSA thus purposely availed itself of the privileges and protections of Maine law and could reasonably anticipate being haled into a court acting pursuant to personal jurisdiction authority conferred by Maine law. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980); *Nicholas v. Buchanan*, 806 F.2d 305, 307 (1st Cir. 1986). The Court therefore denies MPSA's motion to dismiss the claims against it for want of personal jurisdiction.

## II. *Admissibility of Parol Evidence*

At trial the Court admitted *de bene* testimony and documentary evidence relating to the interpretation of the two agreements at issue: the September 3 agreement between NBI and the Limited Partnership and the September 4 side agreement between NBI and Kobritz individually. Defendants NBI and MPSA were granted a continuing objection on relevance grounds to all testimony offered by Plaintiffs regarding the parties' intentions in entering these two agreements. The Court also indicated at the time that Plaintiffs would be granted a continuing objection to all such testimony offered by NBI and MPSA. Finally, Defendants objected to the admission of the superseded September 3 side agreement between NBI and Kobritz individually. The Court must now determine whether parol evidence is admissible for the purpose of interpreting either of the two agreements at issue.

The question before the Court is whether either the September 3 main agreement or the September 4 side agreement is ambiguous. Contract language is ambiguous when it is reasonably susceptible of differ-

ent interpretations; once an ambiguity is found, extrinsic evidence may be admitted and considered to show the intention of the parties, and the interpretation of the ambiguous language is a question of fact. *Portland Valve, Inc. v. Rockwood Systems Corp.*, 460 A.2d 1383, 1387 (Me.1983); *see Restatement (Second) of Contracts* § 212(2) (1979) (stating that interpretation of an integrated agreement is a question of fact if it depends on the credibility of, or the choice among, reasonable inferences to be drawn from, extrinsic evidence).

The Court agrees with Plaintiffs that the September 3 main agreement is ambiguous. That agreement provided that if "the Eastern League ... shall refuse to approve the .sale" of the Double-A franchise to the Limited Partnership, the agreement remained in full force and effect with the modification that the price of the Triple-A franchise would be reduced from $2.4 million to $2 million. But nowhere does the agreement define the term "refuse to approve the sale"; the parties clearly attach different meanings to this term.

Plaintiffs assert that the agreement contemplates a process in which the league directors meet, hear a presentation by Kobritz as to the merits of the proposed transfer, ask any questions they may have, and then conduct a formal vote on whether to approve the sale. In Plaintiffs' view, only a negative vote on the merits of the sale would constitute a "refus[al] to approve the sale" within the meaning of the September 3 agreement. Although Plaintiffs place some emphasis on the approval *process*, their primary focus is on the *reason* for nonapproval.

NBI asserts that no such formal process or decision on the merits was required. NBI contends that representations by the league's president and some directors that they *would* refuse to approve the sale, and/or a refusal by the league directors (pursuant to a telephone poll) to *consider* approving the sale, and/or the mere recitation in the September 22 agreement between NBI and the Eastern League that the league's board of directors refused to approve the sale, are sufficient to consti-

tute "refus[al] to approve the sale" within the meaning of the September 3 agreement. NBI thus sees no requirement of a particular approval process or a particular reason for nonapproval; in NBI's view, any failure to approve would constitute a "refus[al] to approve the sale."

■ Because the term "refuse to approve the sale" is reasonably susceptible of these different interpretations, extrinsic evidence is admissible to show the intent of the parties. The Court also notes that even if the term "refuse to approve the sale" were not ambiguous, consideration of extrinsic evidence is permissible to explain (although not to vary or contradict) the term, in order to understand the parties' obligations, and would be admissible for that purpose.

■ The September 4 side agreement is also ambiguous, in that it refers to "best efforts to obtain Eastern League approval" and to the possibility that "the Eastern League shall fail to approve the purchase" or may "den[y] approval." Extrinsic evidence is therefore admissible to clarify the parties' intent with respect to this ambiguity. Extrinsic evidence is also admissible to explain the terms "best efforts to obtain Eastern League approval," "fail to approve," and "den[y] approval."

■ The final parol evidence question relates to Kobritz's motivation for entering the two agreements at issue. Defendants offered evidence in support of their contention that Kobritz and/or the Limited Partnership never really wanted a Double-A franchise. The recitals to the main September 3 agreement establish, however, that the Limited Partnership was "desirous of acquiring" NBI's Double-A franchise and that NBI was "desirous of selling same" to the Limited Partnership. The recitals to the September 4 side agreement establish that Kobritz and NBI had knowingly agreed to use their best efforts to obtain Eastern League approval of the transfer of the Double-A franchise to the

Limited Partnership. These recitals unambiguously establish the parties' understanding that Kobritz and the Limited Partnership wanted to acquire the Double-A franchise. Defendants seek not to explain or clarify any ambiguity in this understanding but to contradict it directly; parol evidence may not be given effect for that purpose.

### III. *Plaintiffs' Claims Against NBI*

Counts I, II and III of Plaintiffs' claims against NBI all revolve around NBI's asserted duties to act in good faith and to convey the Double-A franchise to the Limited Partnership. The Court will consider the existence of these duties, whether NBI repudiated (Count I) or breached (Count II) them, and whether the September 3 agreement terminated by its own terms (Count III). The Court will then consider whether NBI converted the Triple-A franchise (Count IV) and, finally, whether NBI breached its September 4 side agreement with Kobritz (Count V).

#### A. *Repudiation, Breach, and Termination of the September 3 Agreement*

■ 1. *Good Faith* —Although the Maine Law Court has not confronted the question, this Court has previously assumed that Maine law imposes a general duty of good faith on the parties to a contract. *United States v. H & S Realty Co.,* 647 F.Supp. 1415, 1424 (D.Me.1986); *Reid v. Key Bank of Southern Maine, Inc.,* Civ. No. 85–0088–P, slip op. at 5 (D.Me. Jan. 7, 1986).[13] Although the Uniform Commercial Code does not govern this contract, its definition of good faith as "honesty in fact" is relevant here. *See* Me.Rev.Stat.Ann. tit. 11, § 1–201(19) (1964). Also relevant is *Restatement (Second) of Contracts* § 205, comment e (1979), which declares that subterfuges, evasions, and inaction may constitute bad faith in the performance of a contract and that fair dealing may require more than honesty.

---

**13.** The Court is aware that the judgment in *Reid* is currently on appeal to the Court of Appeals for the First Circuit. In view of the Court's conclusion that NBI acted in good faith, a determination that Maine law does not impose a general duty of good faith on the parties to a contract would not affect the outcome of the instant case.

Finally, the Maine Law Court has defined good faith, although not in the contractual context, as actions taken "honestly, without fraud, collusion, or deceit; really, actually, without pretense." *Waugh v. Prince,* 121 Me. 67, 70, 115 A. 612 (1921) (citation omitted).

Based on the findings of facts set forth above, the Court concludes that NBI acted in good faith throughout the transaction with the Limited Partnership. As early as July, 1986, McGee told Kobritz of the possibility of a dispute over Eastern League territorial rights to Scranton. On September 3, before any agreement was signed, McGee showed Kobritz a copy of his letter to Eshbach discussing the dispute. On September 4, at the time the side agreement was signed, McGee had no inkling that the Eastern League would insist that NBI relinquish its Double-A franchise; he believed in good faith that the dispute could be settled with cash, and he had not led Kobritz to believe otherwise. On September 9 McGee told Kobritz that, although he still hoped the Eastern League would accept a cash settlement, he had agreed to relinquish the franchise in order to open up the Scranton territory in time for the International League meeting. On September 11, McGee told Kobritz that the NBI board had agreed to relinquish the franchise. Thereafter McGee never concealed from Kobritz the fact that he would not convey the Double-A team at the closing. McGee did not engage in subterfuges or evasions; he attempted in good faith and without pretense to obtain Eastern League approval of the transfer. NBI therefore neither repudiated nor breached its obligation of good faith toward the Limited Partnership.

2. *Conveyance of the Double-A Franchise*—Plaintiffs contend that the Eastern League never "refuse[d] to approve the sale" of the Double-A franchise within the meaning of the September 3 agreement. Plaintiffs claim that NBI therefore had a duty to convey the franchise to the Limited Partnership. As noted above, the phrase "refuse to approve the sale" is ambiguous in that it could require a formal vote by the league directors disapproving the sale on its merits, or be satisfied by other, less formal league actions or omissions resulting in nonapproval. The resolution of this ambiguity requires consideration of parol evidence.

The August 20 draft agreement expressly made Eastern League approval a condition precedent of the entire agreement; Eastern League approval was one of the "foregoing conditions" the nonoccurrence of which would terminate the agreement and require the refund of NBI's $100,000 deposit plus interest. Under this draft agreement, neither party assumed the risk of any sort of Eastern League nonapproval; neither party obligated itself to perform in case of such nonapproval. Both Kobritz and McGee assumed that the Eastern League would follow its usual formal procedure for approving the transfer of a franchise; both assumed that the league would grant its approval.

By September 3, a new concern had arisen regarding Eastern League approval: the existence of dissent among Kobritz's limited partners. Both Kobritz and McGee were familiar with the Eastern League's usual procedure for considering proposed franchise transfers; as of September 3 both still expected that the league's directors would meet on September 6, listen to a presentation by Kobritz, ask questions, and then vote either to approve or disapprove the transfer. The only possible basis contemplated by either party for the Eastern League's refusal to approve the transfer was the existence of dissent among Kobritz's limited partners. Neither Kobritz nor McGee had any reason to suspect that the Eastern League would refuse to consider the transfer or that without formal consideration of the merits of the transfer, Eshbach would sign an agreement with NBI reciting that the directors refused to approve the transfer.

By inserting the "refuse to approve" language into the September 3 agreement, the parties thus changed slightly the allocation of risk as compared to the August 20 draft agreement. The Limited Partnership now assumed the specific risk that the Eastern League would consider and reject the

transfer on its merits; in this event the Limited Partnership nevertheless obligated itself to convey the Triple-A franchise for the reduced price of $2 million. As both parties understood, the Limited Partnership was willing to assume the risk of this particular sort of Eastern League nonapproval for one reason and one reason only: that such nonapproval left open the possibility of Eastern League approval of the transfer to Kobritz individually. But the parties never shifted to the Limited Partnership the risk that an entirely unrelated dispute between NBI and the Eastern League would prevent the Eastern League from considering the merits of the transfer either to the Limited Partnership or to Kobritz individually. As under the August 20 draft agreement, neither party assumed the risk of this sort of Eastern League nonapproval; neither party obligated itself to perform in case of this sort of nonapproval.

■ The Court therefore agrees with Plaintiffs that the Eastern League did not "refuse to approve" the transfer within the meaning of the September 3 agreement. The Limited Partnership thus had no duty to convey the Triple-A franchise for the reduced price of $2 million. Neither, however, did NBI have a duty to transfer the Double-A franchise plus $2.4 million; the September 3 agreement expressly stated that "the transfer of the Double-A franchise is subject to the approval of the Eastern League," and the nonoccurrence of this condition discharged NBI's duty. (NBI thus neither repudiated nor breached an obligation to convey the Double-A franchise, as Plaintiffs claim in Counts I and II.) This in turn discharged the Limited Partnership's duty to transfer the Triple-A franchise plus $400,000. *See Lynch v. Stebbins,* 127 Me. 203, 205, 142 A. 735 (1928).

Put another way, an implied-in-fact condition precedent of the September 3 agreement was that the Eastern League would either approve or refuse on the merits to approve the transfer of the Double-A franchise to the Limited Partnership. The parties' exact duties would have differed depending on which of these events occurred, but one or the other was required to occur in order to obligate the Limited Partnership to perform its promise to convey the Triple-A franchise. It is perfectly evident that the parties did not intend their agreement as an open-ended gamble on any and all forms of Eastern League action. They did not contemplate that the Eastern League would demand the franchise for itself and decline even to give Kobritz a hearing. Rather, the parties obligated themselves to perform only if the Eastern League considered the proposed transfer in its usual manner and approved or "refuse[d] to approve" the transfer on the merits. Because this implied-in-fact condition precedent did not occur, the agreement terminated by its own terms and the Limited Partnership must return the $100,000 deposit with interest accrued thereon in accordance with paragraph 14 of the agreement.[14]

In view of this conclusion there is no need to discuss NBI's defenses or counterclaims or to determine the extent of the financial injury, if any, suffered by either Plaintiffs or NBI.

### B. *Conversion*

■ Plaintiffs' Count IV asserts that NBI converted the Triple-A franchise by wrongfully exercising membership rights in the International League without holding title to the franchise. Conversion is "any act or dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it...." *LaVerriere v. Casco Bank & Trust Co.,* 155 Me. 97, 99, 151 A.2d 276 (1959). Plaintiffs rely on *Restatement (Second) of Torts* § 242(2)

---

**14.** This result might also be supported on the theory that performance became impracticable or impossible because of the occurrence of an event—Eastern League refusal to consider the merits of the transfer—the nonoccurrence of which was a basic assumption on which the agreement was made. *See Cohen v. Morneault,* 120 Me. 358, 114 A. 307 (1921); *Restatement (Second) of Contracts* § 261 (1979); *cf.* Me.Rev. Stat.Ann. tit. 11, § 2–615 (1964). But neither party raised this defense to the other's suit on the agreement, and so the Court does not decide that question.

(1964), which declares that "[o]ne who effectively prevents the exercise of intangible rights of the kind customarily merged in a document is subject to a liability similar to that for conversion, even though the document is not itself converted." Maine law apparently recognizes that intangible rights may be converted. *See Northeast Bank of Lewiston & Auburn v. Murphy,* 512 A.2d 344 (Me.1986) (holding insurer and attorney liable for converting bank's lien rights in proceeds of settlement of a lawsuit; not citing *Restatement* § 242(2)); *Ocean Nat'l Bank of Kennebunk v. Diment,* 462 A.2d 35 (Me.1983) (holding bank liable for converting 200 shares of stock; not citing *Restatement* § 242(2)). The Court is skeptical as to whether baseball league membership rights are "customarily merged in a document"; even assuming *arguendo* that they are so merged, no conversion occurred.

A preliminary question arises as to whether NBI actually exercised International League membership rights; the league, after all, recognized MPSA rather than NBI as a member. But NBI and MPSA had agreed that NBI would operate the team on MPSA's behalf; NBI employee Terlecky exercised membership rights at the September 22–23 league meetings, and McGee (whether in his capacity as solicitor of MPSA or president of NBI, or both, the evidence does not clearly show) exercised membership rights at the December 8 league meeting. These facts demonstrate that NBI exercised membership rights as an agent for MPSA.

But the mere exercise of the rights of another is insufficient to constitute conversion. When a party has rightfully come into possession of intangible rights, no conversion has occurred unless and until the party entitled to those rights has demanded their return and the party in possession has refused. *Cf. General Motors Acceptance Corp. v. Anacone,* 160 Me. 53, 83, 197 A.2d 506 (1964); *Restatement (Second) of Torts*

§ 237 (1964); W. Prosser, *Law of Torts* 89 (4th ed. 1971). In the instant case, MPSA rightfully came into possession of the right to *act* as a league member at International League meetings. At Kobritz's request, the International League on September 9 approved the assignment of membership to MPSA. Although (as explained more fully *infra*) no transfer of membership occurred at this time, Kobritz voiced to MPSA no objection to MPSA *acting* as if it had already replaced the Limited Partnership as a league member.[15] In other words, although MPSA did not yet hold membership rights, Kobritz's actions privileged MPSA to exercise the Limited Partnership's membership rights. Until such time as Kobritz demanded that MPSA cease exercising these rights and MPSA refused, no conversion occurred. Because there is no evidence that Kobritz ever made such a demand of MPSA or that MPSA refused it, MPSA did not commit conversion. The same applies to NBI as MPSA's agent.

Even if the Limited Partnership's refusal to convey the Triple-A franchise at the October 21 closing constituted an implied revocation of MPSA's privilege to exercise the Limited Partnership's membership rights, that implied revocation did not amount to an actual demand that MPSA cease exercising those rights. Moreover, had such a demand been made, MPSA might plausibly have made a qualified refusal to cease exercising league membership rights until such time as it could be determined who was entitled to exercise those rights. *See Restatement (Second) of Torts* § 240 (1964). If the Limited Partnership's October 21 filing of its complaint in this action constituted a demand, surely NBI's and MPSA's answers were qualified refusals.

Concepts such as demand, refusal, and qualified refusal, developed to resolve disputes over tangible goods, may seem out of place in this dispute over intangible rights. This incongruity, however, grows not out

15. Kobritz went so far as to ask MPSA representative Terlecky, at the September 22–23 meeting, for *permission* to vote on the "Executive of the Year" award for the season just concluded. Kobritz thus could have appeared to MPSA to feel that, although no actual transfer of membership would occur until the October 21 closing, MPSA might as well begin to *act* as a league member on matters relating to preparations for the upcoming 1987 season.

of any outmoded adherence to the technicalities of the common law but rather out of Plaintiffs' decision to plead conversion instead of other causes of action better suited to this controversy. *See generally id.* § 242, comment e (stating that "conversion" of intangible rights "does not accord very well with the traditional common law limitations of conversion").

### C. *Breach of September 4 Side Agreement*

Plaintiffs' Count V asserts that NBI's bad faith and failure to use its best efforts to obtain Eastern League approval constitute breaches of the September 4 side agreement. The Court has already determined that NBI did not act in bad faith. And there is no strict need to determine whether NBI breached its obligation to exert its best efforts, because the September 4 side agreement was expressly contingent upon NBI's acquisition of the Triple-A franchise pursuant to the September 3 agreement with the Limited Partnership. Moreover, the side agreement was only to become effective if the Eastern League "fail[ed]" to approve the transfer; the Court has found that by this term the parties meant "refuse to approve on the merits," and such a refusal never occurred. The nonoccurrence of these conditions excused NBI's duty to perform the obligations created by the September 4 side agreement, and Plaintiffs cannot recover on that agreement. *See Lynch v. Stebbins,* 127 Me. 203, 142 A. 735 (1928). The Court nevertheless believes it prudent to set forth its conclusion that NBI did not use its best efforts to obtain Eastern League approval of the transfer.

Defendants argue that their agreement to use best efforts is unenforceable because there is no defined standard with which to ascertain what the best efforts obligation entailed. But the case upon which they rely, *Pinnacle Books, Inc. v. Harlequin Enterprises Limited,* 519 F.Supp. 118 (S.D.N.Y.1981), involved an agreement to use best efforts to negotiate another agreement. The court in that case found that that agreement to work toward such an uncertain goal was so vague as to

be unenforceable. But the court was careful to note that "it is possible to infer from the circumstances the standard of performance required by a 'best efforts' clause where the parties have agreed to work toward a specific goal." *Id.* at 121–22 (citing cases).

Here, of course, the parties agreed to work toward the specific goal of obtaining Eastern League approval of the transfer. They may not have provided, for example, that NBI was obligated to offer the Eastern League up to a specified sum of money in order to obtain approval, but the failure to supply this particular sort of objective standard does not prevent the Court from determining what reasonable persons in the same circumstances would consider to be best efforts. Best efforts is a term "which necessarily takes its meaning from the circumstances," *Perma Research & Development Co. v. Singer Co.,* 308 F.Supp. 743, 748 (S.D.N.Y.1970). The term must be defined with reference to a party's experience, expertise, financial status, and other abilities, as well as the opportunities the party creates or faces. *Bloor v. Falstaff Brewing Corp.,* 454 F.Supp. 258, 267 (S.D.N.Y.1978), *aff'd,* 601 F.2d 609 (2d Cir.1979). In view of the extensive evidence regarding NBI's experience with the Eastern League, the league's conduct in the instant case, and the factors prompting NBI to agree to relinquish the Double-A franchise, the best efforts obligation can be given sufficient meaning to create an enforceable standard.

■ The Eastern League's demand for franchise relinquishment was the principal obstacle to obtaining league approval of the transfer of the Double-A franchise to Maine. Because, as the following discussion indicates, McGee failed to use his best efforts to avoid relinquishing the franchise, it follows that McGee failed to use his best efforts to obtain such approval.

Although McGee used his best efforts to induce the Eastern League to accept a cash settlement, he did not use his best efforts to negate the other factors that led him to relinquish the franchise. McGee's belief that the Eastern League would not approve a transfer to Maine on the merits did not

justify relinquishing the franchise. McGee relied on the statements of Eshbach and, at most, one or two Eastern League directors, that Harrisburg, Pennsylvania was thought to be a more desirable location for an Eastern League franchise. Kobritz had not been given a chance to make a presentation to the Eastern League as a whole about the merits of Maine and of his own participation in the Eastern League. With one minor exception, no Eastern League director bore any personal animosity toward Kobritz, and only one director had expressed any reservations about Maine. McGee thus did not use his best efforts to ascertain how the full Eastern League would vote on the merits of the requested transfer to Maine.

McGee's need to issue a "no threat of litigation" opinion letter in order to obtain the $2 million in public financing provided the principal impetus for his precipitate relinquishment of the franchise, but did not justify his doing so. There was no evidence that McGee needed to issue this letter until October 20, 1986, the date he actually did so. Between the date he agreed to relinquish the franchise, September 9, and the date he issued the letter, October 20, McGee had a full six weeks in which to seek a National Association determination of either or both of the key questions: whether Scranton was Eastern League territory and, if so, what was the proper measure of indemnification. McGee had no reason to believe that the National Association could not, if asked to do so, render a decision within that time, or to believe that the Eastern League would not abide by such a decision. Moreover, there was no evidence that the October 21 closing date was etched in stone. Kobritz had

already agreed to McGee's request to move the closing from September 14 to October 21. McGee could have asked Kobritz and the public financing authorities for an extension, but he did not do so, nor did he explore what right, if any, he had under Maine law to delay the closing date. McGee thus failed to use his best efforts to eliminate this source of pressure to reach a quick settlement with the Eastern League.

McGee's belief that it would be fruitless to seek a National Association determination because Johnson had already made up his mind did not justify relinquishing the franchise. The Court has found as fact that Johnson had told McGee on September 8 that *if* the facts were as he had been told, then no exception under Section 10.06 would be necessary to make Scranton Eastern League territory, and that somewhere in the National Association Agreement he (Johnson) *could* find authority to force relinquishment of a franchise and indemnification for a loss of territorial rights. But these statements do not establish reasonable grounds for McGee to believe that Johnson could not be swayed by McGee's presentation of his full case, nor do they establish that an appeal from an adverse decision by Johnson to the National Association Executive Committee would not produce a different result.[16] McGee did not feel bound by the Eastern League's July, 1985 motion purporting to limit NBI's right to seek arbitration of the territorial rights question. Yet McGee never closely examined the National Association Agreement to determine whether the Eastern League's claim had any substantial foundation or to determine the procedures for National Association determination of such a claim.[17]

---

16. In fact, Section 10.06(b) of the National Association Agreement appears to provide that determinations as to territorial rights must be made by the president together with the Executive Committee, and Section 10.08(c) provides that determinations as to indemnification must be made by a five-member Board of Arbitration. Even if Johnson had demonstrated an intent to ignore the provisions and make both determinations himself, Sections 4.09(i) and 6.06(f) appear to permit such determinations to be appealed to the Executive Committee.

17. Statements made at the International League meeting on September 9 also put McGee on notice that he could probably appeal to the Executive Committee any decision made by Johnson.

Had McGee examined the National Association Agreement, he might have noticed that NBI was not seeking to "elevate" within the meaning of that Agreement; "elevation" means to move a club from a Double-A league to a Triple-A league, whereas NBI was merely selling its Double-A club and obtaining a Triple-A club. McGee apparently never recognized this distinc-

McGee was aware that a demand for franchise relinquishment was unprecedented in minor league baseball. McGee, therefore, did not use his best efforts to confirm his perception that the National Association, if asked formally to determine the question, would require him to relinquish the franchise.

Nor was relinquishment justified by McGee's belief that he needed to resolve the Eastern League's territorial rights claim by September 9 in order to secure (by the September 11 date required by the contract) the International League's approval of the transfer of the Triple-A franchise. McGee did not use his best efforts to secure such approval *without* relinquishing the franchise. McGee could have, but did not, explore with either Cooper or Kobritz the possibility of making International League approval contingent upon subsequent satisfactory resolution of the Eastern League's claim. (McGee had been present when the Eastern League had in 1984 approved franchise transfers on a contingent basis and thus he was no stranger to the concept.) Nor did McGee ask Kobritz to extend the September 11 deadline for International League approval in order to give McGee more time to resolve the Eastern League claim without relinquishing the franchise. McGee did not use his best efforts to eliminate the time pressure that led him to agree to relinquish the franchise on September 9.

In conclusion, McGee's failure to use his best efforts to avoid franchise relinquishment, the principle obstacle to obtaining Eastern League approval, necessarily means that McGee failed to use his best efforts to obtain such approval. The best efforts standard as articulated above did not require "Herculean" efforts, as NBI complains. An attempt to ascertain how Eastern League directors felt about the merits of the transfer to Maine, a request to Kobritz for more time, an examination

of the National Association agreement, a request for a National Association determination of the two key issues, a request that the International League's vote be a contingent one—these measures would have involved no great investment of time or money and were reasonably required of McGee under the contractual commitments of NBI. But in view of the nonoccurrence of two conditions of the September 4 agreement—that NBI acquire the Triple-A franchise and that the Eastern League refuse on the merits to approve the transfer—Plaintiffs may not recover upon that agreement.

## IV. *Plaintiffs' Claims Against MPSA*

Plaintiffs assert two claims against MPSA: conversion and fraudulent conveyance. The conversion claim has already been determined, *supra,* adversely to Plaintiffs. What remains is Plaintiffs' claim that the October 20 assignment from NBI to MPSA was fraudulent because (1) NBI had no property interest in the Triple-A franchise that it could assign, and (2) the conveyance was made for less than fair consideration. Plaintiffs seek an avoidance of the transfer and an injunction against MPSA's further exercise of the Limited Partnership's property rights, pursuant to the Uniform Fraudulent Transfer Act, Me. Rev.Stat.Ann. tit. 14, §§ 3571–3582 (Supp. 1986).

The October 20 assignment provided, in pertinent part, that NBI assigned to MPSA both the September 3 agreement with the Limited Partnership and, upon acquisition of the Triple-A franchise, NBI's interest in that franchise. Failing such acquisition, NBI assigned to MPSA its interest in the Double-A franchise, subject to Eastern League approval. Clearly, NBI assigned no greater interest in the Triple-A franchise that it was entitled to assign. Plaintiffs' first theory of fraudulent conveyance—that NBI actually assigned the

---

tion until it was pointed out at trial by the Court. Had McGee examined the National Association Agreement, he might also have noticed that the agreement on its face does not require that a club obtain its league's approval to elevate, or to pay its league indemnification upon

elevation. In short, McGee did surprisingly little to investigate the legal basis for the Eastern League's claim or directly to challenge the Eastern League's demand for franchise relinquishment.

franchise itself on October 20—is therefore without merit.

■ Plaintiffs' second theory, that the assignment was made for less than fair consideration, fails for lack of proof. The consideration for the assignment was MPSA's assumption of "all financial obligations of NBI relating to the advance sale of tickets for games to be played by the Double-A or Triple-A franchise." Plaintiffs have not offered any specific evidence as to the monetary value of these obligations. Nor have they attempted to show the value at the time of the transfer on October 20 of NBI's interest in the September 3 agreement with the Limited Partnership—a value that was uncertain, to say the least, given the low apparent likelihood of a successful closing the following day. Nor have they attempted to show the value on October 20 of the assignment of the Double-A franchise, which assignment would only occur upon the failure to acquire the Triple-A franchise and moreover was subject to the approval of the Eastern League. This value was also highly uncertain, given the probable difficulties in acquiring Eastern League approval. Because Plaintiffs have not met their burden of proving that the assignment was for less than fair consideration, their fraudulent conveyance claim fails.

### V. *Plaintiffs' Claims Against the International League*

#### A. *Failure to Abide by League Constitution*

Plaintiffs have asserted five claims against the International League. In Count I, Plaintiffs allege that the International League violated a duty to operate in accordance with its constitution. The International League argues that this pleading is impermissibly vague, but the Court disagrees. Counsel for the league admitted at trial that he understood that the count could be alleging a breach of contract, and the league itself has asserted a breach of contract claim based on Plain-

tiffs' alleged failure to comply with the league constitution. The Court therefore concludes that Plaintiffs' first count was stated clearly enough to avoid any prejudice to the league's rights.

The parties have stipulated that Virginia law applies to the "formation and corporate status" of the International League and that Maine law applies to all other issues. The Court concludes from this stipulation that any issues involving the interpretation of the league's constitution should be resolved under Virginia law, as the terms of the constitution are inextricably related to the formation and corporate status of the league, but that Maine contract law should govern all other aspects of the current dispute as any breach that occurred was not related to the formation or corporate status of the league. The Court notes, however, that it would reach the same result under either Virginia or Maine law.

■ Plaintiffs allege that the league has violated Article IV Section 1 of its constitution. It is well settled under Maine law that the constitution and bylaws of an organization such as the International League constitute an enforceable contract between the members and the organization [18] and govern their mutual rights and liabilities, provided that said rules are not unreasonable, illegal, or contrary to public policy. *See Bhatnagar v. Mid-Maine Medical Center,* 510 A.2d 233 (Me.1986); *Gashgai v. Maine Medical Ass'n,* 350 A.2d 571 (Me.1976); *Libby v. Perry,* 311 A.2d 527 (Me.1973). Therefore, any violation of the constitution may also constitute a breach of contract.

Article IV, Section 1 of the league constitution reads:

Membership in this League may be assigned only upon the approval of five (5) members of the League, (exclusive of the assignor member), at an annual or special meeting of the League. Assignment of membership shall divest the assignor of, and vest in the assignee, all

---

**18.** The same is true under Virginia law. *See Gottlieb v. Economy Stores,* 199 Va. 848, 102 S.E.2d 345 (1958).

such assignor's right and interest in the League's assets. The assignee, upon accepting membership, must agree to be bound by the Constitution, By-Laws and Rules of this League.

International League president Cooper believed that under this provision, the league actually transferred membership when it voted to approve an assignment. The Court concludes that his interpretation, while held in good faith, is incorrect. The provision requires that the league *approve* an assignment before it can be valid, but it clearly contemplates that it is the member itself which has the exclusive power to do the actual assigning. The provision speaks of the "assignor member" and instructs that assignment "shall divest the *assignor* of, and vest in the assignee, all such *assignor's* right and interest in the League's assets." (Emphasis added.) The best interpretation of this language is that it is the outgoing member, and not the league, which is doing the actual assigning; the league's only role in the process is to grant its approval and thereby confer upon the member the power to effectively assign.

In a situation in which the assignee and assignor have actually executed an assignment that is contingent only upon league approval, then the league's vote will result in a membership transfer by causing the required condition precedent to occur. The league could reasonably have believed that this was the situation on September 9, given Kobritz's comments at that time. However, there came a time, certainly no later than the receipt of the actual contract documents from McGee on October 1, when the league reasonably should have known that no assignment had occurred. At that point, all league actions inconsistent with Plaintiffs' membership rights, such as the league's failure to seat Plaintiffs at the winter meeting in Florida, constituted breachs of contract.

The Court disagrees with the league's contention that Plaintiffs are barred from bringing this action for failure to exhaust internal remedies. It has been the league's consistent position that, under Article IV of its constitution, the vote on September 9 divested Plaintiffs of their status as a league member. The league is therefore estopped from now claiming that Plaintiffs are bound to abide by the league's internal dispute resolution mechanisms. The league cannot treat Plaintiffs as a nonmember and still insist that they follow internal grievance procedures.

In addition, the Court notes that exhaustion of internal remedies is "a principle of policy rather than a limitation of the Court's jurisdiction of the subject-matter," *Gashgai*, 350 A.2d at 576.[19] The exhaustion doctrine reflects "an underlying judicial policy of deferring to an expertness which courts attribute to the other bodies involved" and can be waived when there "is no need of any additional expertise, as might be brought to bear by ... further internal functioning...." *Id.*

The issue posed here is essentially a legal one involving contract interpretation and does not present any specialized question in an area in which the league has particular expertise. Furthermore, the International League has already stipulated that it will seat whichever party the Court determines to be the rightful owner of the team. The Court interprets such a stipulation as a valid waiver of any claim by the league that the Court should await completion of further internal processes before acting. All parties have in fact made it quite clear to the Court they desire a prompt resolution so as to allow for the planning of the 1987 baseball season.

■ Although the Court concludes that the International League did breach its contract with the Plaintiffs by continuing to treat them as nonleague members after learning that they had not yet assigned their membership, it also concludes that the Plaintiffs are entitled to equitable relief

---

19. Virginia law appears to be similar, holding that at least in an administrative agency context,

exhaustion is not required where there is no

only.[20] It is well settled that damages are not recoverable when uncertain, contingent, or speculative. "Damages must be grounded on established positive facts or on evidence from which their existence and amount may be determined to a probability." *Michaud v. Steckino*, 390 A.2d 524, 530 (Me.1978). *See Gottesman & Co. v. Portland Terminal Co.*, 139 Me. 90, 27 A.2d 394 (1942). *See also Restatement (Second) of Contracts* § 352 (1979).

The Court concludes that damages are highly uncertain, contingent, and speculative in this case. First, it is impossible to accurately estimate how well the Plaintiffs' enterprise would have done without any breach by the International League. Kobritz himself admitted at trial that attendance and revenue are highly dependent on factors such as the weather, team performance, and whether or not the Boston Red Sox perform well enough to draw fans away from the Maine Guides. Each of these factors is entirely incapable of prediction. Furthermore, the Plaintiffs have failed to establish with any degree of certainty what effect, if any, the league's actions will have on their expenses or income given that they still have nearly two months to prepare for the season. Finally, the Court finds that the Plaintiffs failed to attempt to reduce or avoid any damages that might occur by not requesting an International League meeting solely on the issue of membership and forcefully laying out their position, and by not making those plans for the upcoming season that might reasonably still have been possible, despite the uncertainty about the team's status.

### B. Breach of Fiduciary Duty to a Minority Shareholder

 In Count II, Plaintiffs allege that the International League breached the fidu-

ciary duty that was owed to them as minority shareholders in the league. The league argues that Plaintiffs are not true minority shareholders because each league member is an equal and that therefore there are no minority members. The Court does not accept the league's analysis; directors and officers of a nonprofit corporation owe a fiduciary duty to the corporation and this includes a duty to deal in good faith with the interests of those in a minority position with regard to any particular issue. This duty attaches regardless of whether any members of an organization occupy an ongoing, formal minority status. However, although the Court concludes that a fiduciary duty was owed to Plaintiffs, it also concludes that this duty was not breached.

Under Maine law,[21] the directors and officers of a nonprofit corporation have a duty to act "in good faith with a view to the interests of the corporation and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions." Me.Rev.Stat.Ann. tit. 13–B § 716 (1964). It is well settled in Maine and elsewhere that "[w]hether officers have been guilty of mismanagement in a particular case is largely a matter of fact dependent upon the circumstances of each case." 3 W. Fletcher, *Cyclopedia of the Law of Corporations* § 1030 at 597 (perm. ed. 1965). *See Atlantic Acoustical & Insulation Co. v. Moreira*, 348 A.2d 263 (Me. 1975). The Court finds that International League president Cooper's actions at the September 9 meeting were entirely reasonable given Kobritz's assertion at the meeting that he had reached a satisfactory agreement with McGee for the transfer of the franchise. Similarly, Cooper acted reasonably in not seating Kobritz at the Sep-

---

benefit to be gained from it. *Mosher Steel-Virginia v. Teig*, 229 Va. 95, 327 S.E.2d 87 (1985).

**20.** Plaintiffs have failed to request damages as a remedy in their first count, specifically asserting that no legal remedy would be adequate to cure both their actual and potential injury, and have instead opted to request equitable relief. This does not, however, preclude the Court from awarding damages, were it to find such relief appropriate. *See Perkins v. Remillard*, 84 F.Supp. 224 (D.Mass.1949); 10 C. Wright, A.

Miller & M. Kane, *Federal Practice and Procedure* § 2664 (2d ed. 1983).

**21.** The Court concludes that an allegation of breach of fiduciary duty relates neither to corporate formation nor to corporate status and that therefore, under the parties' stipulation, Maine law must apply. The Court notes, however, that it would reach the same result under Virginia law.

tember 22 meeting, given Kobritz's untimely and inadequate request and explanation.[22] Once Cooper was finally given documented evidence that actual assignment of the Maine franchise had not yet occurred (which he received from McGee, not Kobritz) he offered Kobritz an opportunity to request rescission of the league vote and full reinstatement as a member.[23] Kobritz declined this offer, failed to articulate his understanding of the situation to Cooper, and failed to make any concerted effort to resolve the situation short of litigation. Throughout this period, Cooper encouraged Kobritz to attend International League meetings and to speak at them. He shared league information with Kobritz and he saw to it that the prospective schedule for the 1987 International League season was drafted in a manner that would accommodate Kobritz should he be recognized as the franchise holder. The Court finds that the International League acted in good faith and with the required degree of diligence, care and skill to try to protect the best interests of the corporation and each of its members. There was no breach of fiduciary duty.

## C. *Wrongful Removal of a Director*

◼ In Count III, Plaintiffs allege that the International League wrongfully removed Kobritz as a director of the league "in violation of the International League Constitution and in violation of the corporate laws of Virginia and the Common Law, and for which there is no adequate legal remedy." In both Maine and Virginia, the common law has been superseded by statutes authorizing shareholders to remove directors with or without cause. *See* Me.Rev.Stat.Ann. tit. 13–B § 704 (1964) and *Scott County Tobacco Warehouses, Inc. v. Harris*, 214 Va. 508, 201 S.E.2d 780

(1974) (discussing Va.Code Ann. § 13.1–42). Under these statutes, a viable cause of action for the wrongful removal of a director would have to be premised on procedural irregularities that would place the validity of the vote in doubt; the statutes severely limit any challenge to the motive of the voters or the merits of their decision. In the current case, the league did not wrongfully remove Kobritz as a director. It did, at his request, vote to approve an assignment of membership from his group to McGee's; this vote was perfectly proper. The allegations made by the Plaintiffs under Count III, *i.e.*, the denial of the rights and privileges of a director to Kobritz, are actually relevant to a claim of conversion, which the Plaintiffs have also made and which the Court will now address.

## D. *Conversion*

◼ As stated above, Maine law recognizes that certain intangible rights may be converted by an exercise of dominion or control over them that is inconsistent with the rights of their true owner. *See Ocean Nat'l Bank of Kennebunk v. Diment*, 462 A.2d 35 (Me.1983). Again, the Court questions whether baseball league membership rights are "customarily merged in a document" and thus questions whether such rights may be converted. *See Restatement (Second) of Torts* § 242(2) (1964). Assuming *arguendo* that they may be, the Court nevertheless concludes that no conversion occurred.

Plaintiffs allege that the league interfered with the Limited Partnership's exercise of its league membership rights. However, in a case like the present one in which the league's initial actions were not wrongful, later wrongful interference will

---

**22.** As previously noted, Kobritz's request came just minutes before the beginning of the meeting and was not accompanied by any written documentation of the status of his arrangement with NEB. In addition, although Kobritz was an attorney and knew that Cooper was not, he never tried at this or any other point to explain to Cooper why he interpreted the constitution's language the way he did.

**23.** Kobritz claims that he declined this offer because he felt it entailed submitting to Interna-

tional League jurisdiction the issue of who was the rightful owner of the franchise—a judgment he felt the league had no authority to make. However he failed to make the obvious counter-proposal and request that the league meet solely to consider the proper interpretation of Article IV and whether Kobritz was still a member by virtue of the fact that there had never been a completed assignment from the Limited Partnership to NBI or MPSA.

not constitute a conversion unless a proper demand and wrongful refusal have been made. Under the *Restatement (Second) of Torts* § 240(1) (1964), which by analogy governs the conversion of intangible rights,

> one in possession of a chattel who is in reasonable doubt as to the right of a claimant to its immediate possession does not become a converter by making a qualified refusal to surrender the chattel to the claimant for the purpose of affording a reasonable opportunity to inquire into such right.

Two issues must therefore be resolved: did the league have cause for reasonable doubt as to Plaintiffs' right to exercise membership privileges and, if so, did it make a qualified refusal for the purpose of affording a reasonable opportunity to inquire into the matter?

Prior to receiving a copy of the September 3 agreement on October 1, there is no question that the league's actions were entirely reasonable. Kobritz's comments at the September 9 meeting left a clear impression among league members that his transaction with McGee was complete and final and contingent only upon league approval. It was perfectly reasonable for the league members to therefore believe that after their vote Kobritz ceased to be a member. Similarly, Cooper acted entirely reasonably when he declined to seat Kobritz at the meeting of September 22 and 23. Kobritz's claim that his arrangement with McGee was not final and that he was still a member was made only minutes before the meeting was called to order, and it was not supported at that time by any written documentation. The Court also concludes that Cooper's doubt as to Kobritz's membership was reasonable even after he received copies of the contract and learned that the closing between McGee and Kobritz had not yet occurred. Cooper's understanding that Article IV of the league constitution dictated that membership changed hands upon league approval was incorrect, but it was not unreasonable. The Court believes the assertions of Cooper and league vice-president Rosenfield that the clause had been consistently so interpreted by league members for many years.

The language of the provision is not so clear as to make Cooper's interpretation an unreasonable one.

The Court also finds that Cooper's refusal to grant Kobritz membership rights was a qualified one, made for the purpose of affording a reasonable opportunity to inquire into who was properly entitled to exercise such rights. On at least three separate occasions, Cooper offered to call a special meeting to investigate the issue if Kobritz so requested. Cooper's first action after receiving Kobritz's letter of September 25 was to ask McGee if in fact there was a deal and to request documentation from him. Once Plaintiffs filed their suit against NBI on October 21, Cooper decided to wait for the Court's determination of who properly owned the franchise, and on December 1 and several times thereafter, Cooper has indicated that he would recognize the prevailing party as a league member. Throughout this period Cooper took numerous steps to safeguard Kobritz's rights. He encouraged him to attend and speak at all league meetings, he canceled the meeting scheduled for November to allow the parties more time to settle the matter among themselves, and he required that the 1987 league schedule be constructed so that it could accommodate either party. In sum, Cooper did afford Kobritz an opportunity to have the matter investigated and was turned down by Kobritz; thereafter he decided to await the Court's determination of who properly owned the franchise, having received assurances from the Court that the matter would be expeditiously resolved. In the interim he took repeated affirmative steps to minimize any prejudice to Kobritz's rights. Plaintiffs' claim of conversion therefore fails.

### E. *Tortious Interference with Contractual Relations*

Finally, Plaintiffs charge that the league tortiously interfered with their contractual relations with NBI. This claim is groundless. The tort of interference with a contractual relationship includes as one of its basic elements that the actor act with the purpose of interfering with the contract, that he desire to so interfere, or,

under certain circumstances, that he at least know that interference will be a necessary consequence of his action. *Restatement (Second) of Torts* § 766, comment j (1977). In Maine, liability for tortious interference with a contract will attach only upon proof that such interference included some element of fraud or intimidation. *MacKerron v. Madura*, 445 A.2d 680, 683 (Me.1982). Plaintiffs have failed to produce any evidence that the league intended to interfere with their contractual relations or that their actions in any way were fraudulent or improperly intimidating.

### VI. *The International League's Counterclaim and Third-Party Complaint*

As explained *supra*, at 518, the league's first claim has been bifurcated and its second claim is now moot. The league's third claim, tortious interference with business relationships or with prospective business advantage, fails for lack of proof of fraud or intimidation. *MacKerron v. Madura*, 445 A.2d 680, 683 (Me.1982). (See discussion *supra*.) The league's final claim, alleging breach of contract, also fails. As discussed above, the league is estopped from claiming that Plaintiffs were bound to abide by the league constitution while at the same time maintaining that they were no longer a league member. Finally, as regards NBI and MPSA, the league has failed to offer any evidentiary support for its breach of contract allegation.

### VII.

The foregoing findings of fact and conclusions of law support the judgment issued on February 20, 1987.